# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued December 9, 2005         Decided June 23, 2006

No. 04-1434

PHILLIP GOLDSTEIN, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

―――――

On Petition for Review of an Order of the
Securities and Exchange Commission

―――――

*Philip D. Bartz* argued the cause for petitioners. With him on the briefs were *Cameron Cohick* and *Gregory E. Keller*.

*Jacob H. Stillman*, Solicitor, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Giovanni P. Prezioso*, General Counsel, *Randall W. Quinn*, Assistant General Counsel, and *Dominick V. Freda*, Senior Counsel.

Before: RANDOLPH and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: This is a petition for review of the Securities and Exchange Commission's regulation of "hedge funds" under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq. See* Registration Under the Advisers Act of Certain Hedge Fund Advisers, 69 Fed. Reg. 72,054 (Dec. 10, 2004) (codified at 17 C.F.R. pts. 275, 279) ("*Hedge Fund Rule*"). Previously exempt because they had "fewer than fifteen clients," 15 U.S.C. § 80b-3(b)(3), most advisers to hedge funds must now register with the Commission if the funds they advise have fifteen or more "shareholders, limited partners, members, or beneficiaries." 17 C.F.R. § 275.203(b)(3)-2(a). Petitioners Philip Goldstein, an investment advisory firm Goldstein co-owns (Kimball & Winthrop), and Opportunity Partners L.P., a hedge fund in which Kimball & Winthrop is the general partner and investment adviser (collectively "Goldstein") challenge the regulation's equation of "client" with "investor."

## I.

"Hedge funds" are notoriously difficult to define. The term appears nowhere in the federal securities laws, and even industry participants do not agree upon a single definition. *See, e.g.*, SEC Roundtable on Hedge Funds (May 13, 2003) (comments of David A. Vaughan), *available at* http://www.sec.gov/spotlight/hedgefunds/hedge-vaughn.htm (citing fourteen different definitions found in government and industry publications). The term is commonly used as a catch-all for "any pooled investment vehicle that is privately organized, administered by professional investment managers, and not widely available to the public." PRESIDENT'S WORKING GROUP ON FINANCIAL MARKETS, HEDGE FUNDS, LEVERAGE, AND THE LESSONS OF LONG-TERM CAPITAL MANAGEMENT 1 (1999) ("*Working Group Report*"); *see also* IMPLICATIONS OF THE GROWTH OF HEDGE FUNDS: STAFF REPORT TO THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION 3 (2003)

("*Staff Report*") (defining "hedge fund" as "an entity that holds a pool of securities and perhaps other assets, whose interests are not sold in a registered public offering and which is not registered as an investment company under the Investment Company Act").

Hedge funds may be defined more precisely by reference to what they are *not*. The Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*, directs the Commission to regulate any issuer of securities that "is or holds itself out as being engaged primarily . . . in the business of investing, reinvesting, or trading in securities." *Id.* § 80a-3(a)(1)(A). Although this definition nominally describes hedge funds, most are exempt from the Investment Company Act's coverage because they have one hundred or fewer beneficial owners and do not offer their securities to the public, *id.* § 80a-3(c)(1), or because their investors are all "qualified" high net-worth individuals or institutions, *id.* § 80a-3(c)(7).[1] Investment vehicles that remain private and available only to highly sophisticated investors have historically been understood not to present the same dangers to public markets as more widely available investment companies, like mutual funds.[2] *See Staff Report*, *supra*, at 11-12, 13.

Exemption from regulation under the Investment Company Act allows hedge funds to engage in very different

[1] Hedge funds are usually differentiated from other exempted investment vehicles like private equity or venture capital funds by their investing and governance behavior. *See Hedge Fund Rule*, 69 Fed. Reg. at 72,073 nn.224-225.

[2] Mutual funds make up the vast majority of registered investment companies, with about $6.4 trillion under management in December 2002. *See Staff Report*, *supra*, at 1 n.4. Although precise data are unavailable, some estimates of the size of the hedge fund industry range from about $600 billion, *id.*, to close to $900 billion, *Hedge Fund Rule*, 69 Fed. Reg. at 72,055 & n.20.

investing behavior than their mutual fund counterparts. While mutual funds, for example, must register with the Commission and disclose their investment positions and financial condition, *id.* §§ 80a-8, 80a-29, hedge funds typically remain secretive about their positions and strategies, even to their own investors. *See Staff Report*, *supra*, at 46-47. The Investment Company Act places significant restrictions on the types of transactions registered investment companies may undertake. Such companies are, for example, foreclosed from trading on margin or engaging in short sales, 15 U.S.C. § 80a-12(a)(1), (3), and must secure shareholder approval to take on significant debt or invest in certain types of assets, such as real estate or commodities, *id.* § 80a-13(a)(2). These transactions are all core elements of most hedge funds' trading strategies. *See Staff Report*, *supra*, at 33-43. "Hedging" transactions, from which the term "hedge fund" developed, *see* Willa E. Gibson, *Is Hedge Fund Regulation Necessary?*, 73 TEMP. L. REV. 681, 684-85 & n.18 (2000), involve taking both long and short positions on debt and equity securities to reduce risk. This is still the most frequently used hedge fund strategy, *see Staff Report*, *supra*, at 35, though there are many others. Hedge funds trade in all sorts of assets, from traditional stocks, bonds, and currencies to more exotic financial derivatives and even non-financial assets. *See, e.g.*, Kate Kelly, *Creative Financing: Defying the Odds, Hedge Funds Bet Billions on Movies*, WALL ST. J., Apr. 29, 2006, at A1. Hedge funds often use leverage to increase their returns.

Another distinctive feature of hedge funds is their management structure. Unlike mutual funds, which must comply with detailed requirements for independent boards of directors, 15 U.S.C. § 80a-10, and whose shareholders must explicitly approve of certain actions, *id.* § 80a-13, domestic hedge funds are usually structured as limited partnerships to achieve maximum separation of ownership and management. In the typical arrangement, the general partner manages the fund

(or several funds) for a fixed fee and a percentage of the gross profits from the fund. The limited partners are passive investors and generally take no part in management activities. *See Staff Report*, *supra*, at 9-10, 61.

Hedge fund advisers also had been exempt from regulation under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("Advisers Act"), a companion statute to the Investment Company Act, and the statute which primarily concerns us in this case. Enacted by Congress to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor*" in the investment advisory profession, *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963), the Advisers Act is mainly a registration and anti-fraud statute. Non-exempt "investment advisers" must register with the Commission, 15 U.S.C. § 80b-3, and all advisers are prohibited from engaging in fraudulent or deceptive practices, *id.* § 80b-6. By keeping a census of advisers, the Commission can better respond to, initiate, and take remedial action on complaints against fraudulent advisers. *See id.* § 80b-4 (authorizing the Commission to examine registered advisers' records).

Hedge fund general partners meet the definition of "investment adviser" in the Advisers Act. *See* 15 U.S.C. § 80b-2(11) (defining "investment adviser" as one who "for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities"); *Abrahamson v. Fleschner*, 568 F.2d 862, 869-71 (2d Cir. 1977) (holding that hedge fund general partners are "investment advisers"), *overruled in part on other grounds by Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979). But they usually satisfy the "private adviser exemption" from registration in § 203(b)(3) of the Act, 15 U.S.C. § 80b-3(b)(3). That section exempts "any investment adviser who

during the course of the preceding twelve months has had fewer than fifteen clients and who neither holds himself out generally to the public as an investment adviser nor acts as an investment adviser to any investment company registered under [the Investment Company Act]." *Id.* As applied to limited partnerships and other entities, the Commission had interpreted this provision to refer to the partnership or entity itself as the adviser's "client." *See* 17 C.F.R. § 275.203(b)(3)-1. Even the largest hedge fund managers usually ran fewer than fifteen hedge funds and were therefore exempt.

Although the Commission has a history of interest in hedge funds, *see Staff Report*, *supra*, at app.A, the current push for regulation had its origins in the failure of Long-Term Capital Management, a Greenwich, Connecticut-based fund that had more than $125 billion in assets under management at its peak. In late 1998, the fund nearly collapsed. Almost all of the country's major financial institutions were put at risk due to their credit exposure to Long-Term, and the president of the Federal Reserve Bank of New York personally intervened to engineer a bailout of the fund in order to avoid a national financial crisis. *See generally* ROGER LOWENSTEIN, WHEN GENIUS FAILED: THE RISE AND FALL OF LONG-TERM CAPITAL MANAGEMENT (2000).

A joint working group of the major federal financial regulators produced a report recommending regulatory changes to the regime governing hedge funds, and the Commission's staff followed with its own report about the state of hedge fund regulation. Drawing on the conclusions in the *Staff Report*, the Commission – over the dissent of two of its members – issued the rule under review in December 2004 after notice and comment. The Commission cited three recent shifts in the hedge fund industry to justify the need for increased regulation. First, despite the failure of Long-Term Capital Management,

hedge fund assets grew by 260 percent from 1999 to 2004. *Hedge Fund Rule*, 69 Fed. Reg. at 72,055. Second, the Commission noticed a trend toward "retailization" of hedge funds that increased the exposure of ordinary investors to such funds. This retailization was driven by hedge funds loosening their investment requirements, the birth of "funds of hedge funds" that offered shares to the public, and increased investment in hedge funds by pension funds, universities, endowments, foundations and other charitable organizations. *See id.* at 72,057-58. Third, the Commission was concerned about an increase in the number of fraud actions brought against hedge funds. *See id.* at 72,056-57. Concluding that its "current regulatory program for hedge fund advisers [was] inadequate," *id.* at 72,059, the Commission moved to require hedge fund advisers to register under the Advisers Act so that it could gather "basic information about hedge fund advisers and the hedge fund industry," "oversee hedge fund advisers," and "deter or detect fraud by unregistered hedge fund advisers," *id.*

The *Hedge Fund Rule* first defines a "private fund" as an investment company that (a) is exempt from registration under the Investment Company Act by virtue of having fewer than one hundred investors or only qualified investors, *see* 15 U.S.C. § 80a-3(c)(1), (7); (b) permits its investors to redeem their interests within two years of investing; and (c) markets itself on the basis of the "skills, ability or expertise of the investment adviser." 17 C.F.R. § 275.203(b)(3)-1(d)(1). For these private funds, the rule then specifies that "[f]or purposes of section 203(b)(3) of the [Advisers] Act (15 U.S.C. § 80b-3(b)(3)), you must count as clients the shareholders, limited partners, members, or beneficiaries . . . of [the] fund." *Id.* § 275.203(b)(3)-2(a). The rule had the effect of requiring most hedge fund advisers to register by February 1, 2006.[3]

---

[3] Application of the rule also triggers certain regulations that apply only to *registered* advisers. Most importantly, registered

8

II.

The dissenting Commissioners disputed the factual predicates for the new rule and its wisdom. Goldstein makes some of the same points but the major thrust of his complaint is that the Commission's action misinterpreted § 203(b)(3) of the Advisers Act, a charge the Commission dissenters also leveled. This provision exempts from registration "any investment adviser who during the course of the preceding twelve months has had fewer than fifteen *clients*." 15 U.S.C. § 80b-3(b)(3) (emphasis added). The Act does not define "client." Relying on *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984), the Commission believes this renders the statute "ambiguous as to a method for counting clients." Br. for Resp. 21. There is no such rule of law. The lack of a statutory definition of a word does not necessarily render the meaning of a word ambiguous, just as the presence of a definition does not necessarily make the meaning clear. A definition only pushes the problem back to the meaning of the defining terms. *See Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1068-70 (D.C. Cir. 1997); *Doris Day Animal League v. Veneman*, 315 F. 3d 297, 298-99 (D.C. Cir. 2003).

If Congress employs a term susceptible of several meanings, as many terms are, it scarcely follows that Congress has authorized an agency to choose *any* one of those meanings. As always, the "words of the statute should be read in context, the statute's place in the overall statutory scheme should be

---

advisers must open their records to the Commission upon request, 15 U.S.C. § 80b-4, and cannot charge their clients a performance fee unless such clients have a net worth of at least $1.5 million or at least $750,000 under management with the adviser. *Id*. § 80b-5; 17 C.F.R. § 275.205-3; *see also Hedge Fund Rule*, 69 Fed. Reg. at 72,064 (citing "salutary effect" of this rule to limit "retailization").

considered, and the problem Congress sought to solve should be taken into account" to determine whether Congress has foreclosed the agency's interpretation. *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("*PDK I*") (internal quotation marks omitted).

"Client" may mean different things depending on context. The client of a laundry occupies a very different position than the client of a lawyer. Even for professional representation, the specific indicia of a client relationship – contracts, fees, duties, and the like – vary with the profession and with the particulars of the situation. An attorney-client relationship, for example, can be formed without any signs of formal "employment." *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 & cmt. c (2000) ("The client need not necessarily pay or agree to pay the lawyer; and paying a lawyer does not by itself create a client-lawyer relationship . . .."). Matters may be very different for the client of, say, an architectural firm.

The Commission believes that an amendment to § 203(b)(3) suggests the possibility that an investor in a hedge fund could be counted as a client of the fund's adviser. In 1980, Congress added to § 203(b)(3) the following language: "For purposes of determining the number of clients of an investment adviser under this paragraph, no shareholder, partner, or beneficial owner of a business development company . . . shall be deemed to be a client of such investment adviser unless such person is a client of such investment adviser separate and apart from his status as a shareholder, partner, or beneficial owner."[4]

---

[4] A "business development company" – commonly known as a venture capital company – is defined in 15 U.S.C. §80a-2(a)(48) as a "closed-end company which" operates for the purpose of making investments in certain securities and making "available significant managerial assistance with respect to the issuers of such securities."

Act of Oct. 21, 1980, Pub. L. No. 96-477, § 202, 94 Stat. 2275, 2290 (1980). This language was inserted against a backdrop of uncertainty created by the Second Circuit's decision in *Abrahamson v. Fleschner*. The *Abrahamson* court held that hedge fund general partners were "investment advisers" under the Advisers Act, 568 F.2d at 869-71. In its original opinion, the court specified that the general partners were advisers "to the limited partners." *See* Robert C. Hacker & Ronald D. Rotunda, *SEC Registration of Private Investment Partnerships After* Abrahamson v. Fleschner, 78 COLUM. L. REV. 1471, 1484 n.72 (1978). The final published opinion omits those four words, *see Abrahamson*, 568 F.2d at 871 n.16, suggesting that the court expressly declined to resolve any ambiguity in the term "client." If – as we generally assume – Congress was aware of this judicial confusion, *see, e.g.*, *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 945-46 (D.C. Cir. 2005), the 1980 amendment could be seen as Congress's acknowledgment that "client" is ambiguous in the context of § 203(b)(3). There are statements in the legislative history that suggest as much. *See, e.g.*, H.R. REP. NO. 96-1341, at 62 (1980) ("[W]ith respect to persons or firms which *do not* advise business development companies, the . . . amendment . . . is not intended to suggest that each shareholder, partner, or beneficial owner of a company advised by such person or firm *should or should not be* regarded as a client . . . ." (emphasis added)). Although "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *PDK I*, 362 F.3d at 794-95 (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)), the 1980 amendment might be seen as introducing another definitional possibility into the statute. *See PDK Labs. Inc. v. DEA*, 438 F.3d 1184, 1192-93 (D.C. Cir. 2006).[5]

---

[5] There is irony in the Commission's reliance on this amendment to demonstrate the ambiguity of "client." As we discuss below, the Commission in 1985 established a "safe harbor," allowing advisers to count certain limited partnerships as *single clients*

On the other hand, a 1970 amendment to § 203 appears to reflect Congress's understanding at the time that investment company entities, not their shareholders, were the advisers' clients. In the amendment, Congress eliminated a separate exemption from registration for advisers who advised only investment companies and explicitly made the fewer-than-fifteen-clients exemption unavailable to such advisers. Investment Company Amendments Act of 1970, Pub. L. No. 91-547, § 24, 84 Stat. 1413, 1430 (1970). This latter prohibition would have been unnecessary if the shareholders of investment companies could be counted as "clients."

Another section of the Advisers Act strongly suggests that Congress did not intend "shareholders, limited partners, members, or beneficiaries" of a hedge fund to be counted as "clients." Although the statute does not define "client," it does define "investment adviser" as "any person who, for compensation, engages in the business of advising others, either *directly* or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(11) (emphasis added). An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice *directly*. He invests a portion of his assets in the fund. The fund manager – the adviser – controls the disposition of the pool of capital in the fund. The adviser does not tell the *investor* how to spend his money; the investor made that decision when

---

specifically in order to provide "greater certainty" about the meaning of the term. Definition of "Client" of Investment Adviser for Certain Purposes Relating to Limited Partnerships, 50 Fed. Reg. 8740, 8740 (Mar. 5, 1985) ("*Safe Harbor Proposed Rule*"). In so doing, the Commission declared that it "should [not] distinguish such a limited partnership from a business development partnership," and that it was therefore "incorporat[ing] the approach of the 1980 Amendments into a limited partnership rule." *Id.* at 8741.

he invested in the fund. Having bought into the fund, the investor fades into the background; his role is completely passive. If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then *a fortiori* each investor cannot be a "client" of that person or entity. These are just two sides of the same coin.

This had been the Commission's view until it issued the new rule. As recently as 1997, it explained that a "client of an investment adviser typically is provided with individualized advice that is based on the client's financial situation and investment objectives. In contrast, the investment adviser of an investment company need not consider the individual needs of the company's shareholders when making investment decisions, and thus has no obligation to ensure that each security purchased for the company's portfolio is an appropriate investment for each shareholder." Status of Investment Advisory Programs Under the Investment Company Act of 1940, 62 Fed. Reg. 15,098, 15,102 (Mar. 31, 1997). The Commission said much the same in 1985 when it promulgated a rule with respect to investment companies set up as limited partnerships rather than as corporations. The "client" for purposes of the fifteen-client rule of § 203(b)(3) is the limited partnership not the individual partners. *See* 17 C.F.R. § 275.203(b)(3)-1(a)(2). As the Commission wrote in proposing the rule, when "an adviser to an investment pool manages the assets of the pool on the basis of the investment objectives of the participants as a group, it appears appropriate to view the pool – rather than each participant – as a client of the adviser." *Safe Harbor Proposed Rule*, 50 Fed. Reg. at 8741.

The Supreme Court embraced a similar conception of the adviser-client relationship when it held in *Lowe v. SEC*, 472 U.S. 181 (1985), that publishers of certain financial newsletters were not "investment advisers." *Id.* at 211; *see* 15 U.S.C. § 80b-

2(11)(D). After an extensive discussion of the legislative history of the Advisers Act, the Court held that existence of an advisory relationship depended largely on the character of the advice rendered. Persons engaged in the investment advisory profession "provide personalized advice attuned to a client's concerns." *Lowe*, 472 U.S. at 208. "[F]iduciary, person-to-person relationships" were "characteristic" of the "investment adviser-client relationship[]." *Id.* at 210. The Court thought it "significant" that the Advisers Act "repeatedly" referred to "clients," which signified to the Court "the kind of fiduciary relationship the Act was designed to regulate." *Id.* at 208 n.54, 201 n.45. This type of direct relationship exists between the adviser and the fund, but not between the adviser and the investors in the fund. The adviser is concerned with the fund's performance, not with each investor's financial condition.

The Commission nevertheless is right to point out that the *Lowe* Court was not rendering an interpretation of the word "client." *See Hedge Fund Rule*, 69 Fed. Reg. at 72,069 n.174. Because it was construing an exception to the definition of "investment adviser," we do not read too much into the Court's understanding of the meaning of "client." *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2700 (2005).

As we have noted before, "[i]t may be that . . . the strict dichotomy between clarity and ambiguity is artificial, that what we have is a continuum, a probability of meaning." *PDK I*, 362 F.3d at 797. Here, even if the Advisers Act does not foreclose the Commission's interpretation, the interpretation falls outside the bounds of reasonableness. "An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority. It does not matter whether the unlawful action arises because the disputed regulation defies the plain language of a statute or

because the agency's construction is utterly unreasonable and thus impermissible." *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003); *see also id.* at 1177-78; *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005).

"The 'reasonableness' of an agency's construction depends," in part, "on the construction's 'fit' with the statutory language, as well as its conformity to statutory purposes." *Abbott Labs. v. Young*, 920 F.2d 984, 988 (D.C. Cir. 1990). As described above, the Commission's interpretation of the word "client" comes close to violating the plain language of the statute. At best it is counterintuitive to characterize the investors in a hedge fund as the "clients" of the adviser. *See Am. Bar Ass'n v. FTC*, 430 F.3d 457, 471 (D.C. Cir. 2005). The adviser owes fiduciary duties only to the fund, not to the fund's investors. Section 206 of the Advisers Act, 15 U.S.C. § 80b-6, makes it unlawful for any investment adviser – registered or not – "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *Id*. § 80b-6(2). In *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), the Supreme Court held that this provision created a fiduciary duty of loyalty between an adviser and his client. *See id. at* 191-92; *id.* at 201 ("The statute, in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested."); *see also Hedge Fund Rule*, 69 Fed. Reg. at 72,059 & n.57. In that case, the duty of loyalty required an adviser to disclose self-interested transactions to his clients. The Commission recognizes more generally that the duty of loyalty "requires advisers to manage their clients' portfolios in the best interest of clients," and imposes obligations to "fully disclose any material conflicts the adviser has with its clients, to seek best execution for client transactions, and to have a reasonable basis for client recommendations." *Id.* at 72,054.

If the investors are owed a fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest. Consider an investment adviser to a hedge fund that is about to go bankrupt. His advice to the fund will likely include any and all measures to remain solvent. His advice to an investor in the fund, however, would likely be to sell. For the same reason, we do not ordinarily deem the shareholders in a corporation the "clients" of the corporation's lawyers or accountants. *See* RESTATEMENT, *supra*, § 96 cmt.b ("By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals . . . who have an ownership or other beneficial interest in it, such as its shareholders."). While the shareholders may benefit from the professionals' counsel indirectly, their individual interests easily can be drawn into conflict with the interests of the entity. It simply cannot be the case that investment advisers are the servants of two masters in this way.[6]

The Commission's response to this argument is telling. It argues that the *Hedge Fund Rule* amends *only* the method for counting clients under § 203(b)(3), and that it does not "alter the duties or obligations owed by an investment adviser to its

---

[6] In the *Hedge Fund Rule*, 69 Fed. Reg. at 72,070 n.187, and again at oral argument, Tr. of Oral Argument 16-17, the Commission argued that the fiduciary duties created by the anti-fraud provisions of the Advisers Act did in fact extend to the relationship between an adviser and the limited partners of a hedge fund. The Commission relies on *Abrahamson v. Fleschner*, in which the Second Circuit found that limited partners of a hedge fund stated a cause of action against the general partner for fraud under § 206. 568 F.2d at 877-78. The anti-fraud provision also applies, however, to persons other than clients. *See* 15 U.S.C. § 80b-6(4). In the absence of further specification, *Abrahamson* can only be read for the proposition that investors in a hedge fund may sustain an action for fraud against the fund's adviser. *Cf. United States v. Elliott*, 62 F.3d 1304, 1311-13 (11th Cir. 1995) (holding that adviser-client relationship was not required for criminal fraud conviction under § 206).

clients." 69 Fed. Reg. at 72,070. We ordinarily presume that the same words used in different parts of a statute have the same meaning. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). The Commission cannot explain why "client" should mean one thing when determining to whom fiduciary duties are owed, 15 U.S.C. § 80b-6(1)-(3), and something else entirely when determining whether an investment adviser must register under the Act, *id.* § 80b-3(b)(3). *Cf. Mobil Oil Corp. v. EPA*, 871 F.2d 149, 153 (D.C. Cir. 1989).

The Commission also argues that the organizational form of most hedge funds is merely "legal artifice," Br. for Resp. 41, to shield advisers who want to advise more than fifteen clients and remain exempt from registration. *See Hedge Fund Rule*, 69 Fed. Reg. at 72,068. But as the discussion above shows, form matters in this area of the law because it dictates to whom fiduciary duties are owed.

The *Hedge Fund Rule* might be more understandable if, over the years, the advisory relationship between hedge fund advisers and investors had changed. The Commission cited, as justification for its rule, a rise in the amount of hedge fund assets, indications that more pension funds and other institutions were investing in hedge funds, and an increase in fraud actions involving hedge funds. All of this may be true, although the dissenting Commissioners doubted it. But without any evidence that the role of fund advisers with respect to investors had undergone a transformation, there is a disconnect between the factors the Commission cited and the rule it promulgated. That the Commission wanted a hook on which to hang more comprehensive regulation of hedge funds may be understandable. But the Commission may not accomplish its objective by a manipulation of meaning.

The Commission has, in short, not adequately explained how the relationship between hedge fund investors and advisers justifies treating the former as clients of the latter. *See Shays v. FEC*, 414 F.3d 76, 96-97 (D.C. Cir. 2005) (explaining that agency interpretation is not "reasonable" if it is "arbitrary and capricious"). The Commission points to its finding that a hedge fund adviser sometimes "may not treat all of its hedge fund investors the same." *Hedge Fund Rule*, 69 Fed. Reg. at 72,069-70 (citing different lock-up periods, greater access to information, lower fees, and "side pocket" arrangements). From this the Commission concludes that each account of a hedge fund investor "*may* bear many of the characteristics of separate investment accounts, which, of course, must be counted as separate clients." *Id.* at 72,070. But the Commission's conclusion does not follow from its premise. It may be that different classes of investors have different rights or privileges with respect to their investments.[7] This reveals little, however, about the *relationship* between the investor and the adviser. Even if it did, the Commission has not justified treating *all* investors in hedge funds as clients for the purpose of the rule. If there are certain characteristics present in some investor-adviser relationships that mark a "client" relationship, then the Commission should have identified those characteristics and tailored its rule accordingly.

By painting with such a broad brush, the Commission has failed adequately to justify departing from its own prior interpretation of § 203(b)(3). *See Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 12 (D.C. Cir. 2005) (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

---

[7] This is in fact a common arrangement throughout the law of business organizations. Many corporations, for example, have different classes of common or preferred stock. Although different classes of stockholders have different rights or privileges, the basic fiduciary duties of managers to shareholders remain uniform.

As we have discussed, in 1985 the Commission adopted a "safe harbor" for general partners of limited partnerships, enabling them to count the partnership as a single "client" for the purposes of § 203 so long as they provided advice to a "collective investment vehicle" based on the investment objectives of the limited partners as a group. *Safe Harbor Proposed Rule*, 50 Fed. Reg. at 8741. This "safe harbor" remains part of the Commission's rules and has since been expanded to include corporations, limited liability companies, and business trusts (hedge funds sometimes take these less common forms, *see Staff Report*, *supra*, at 9-10 & n.27). The *Hedge Fund Rule* therefore appears to carve out an exception from this safe harbor solely for investment entities that have fewer than one hundred-one but more than fourteen investors. *Compare* 17 C.F.R. § 275.203(b)(3)-1, *with id.* § 275.203(b)(3)-2. As discussed above, the Commission does not justify this exception by reference to any change in the nature of investment adviser-client relationships since the safe harbor was adopted. Absent such a justification, its choice appears completely arbitrary. *See Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005) ("A statutory interpretation . . . that results from an unexplained departure from prior [agency] policy and practice is not a reasonable one.").

Nor is this choice any more rational when viewed in light of the policy goals underlying the Advisers Act. *See Abbott Labs.*, 920 F.2d at 988. The Commission recites Congress's findings in § 201 that investment advisory activities "substantially . . . affect . . . national securities exchanges . . . and the national economy," 15 U.S.C. § 80b-1(3), and concludes that "[i]n enacting [section 203(b)(3)], Congress exempted from the registration requirements a category of advisers whose activities were not sufficiently large or national in scope." *Hedge Fund Rule*, 69 Fed. Reg. at 72,067. The Commission reasons that because hedge funds are now national in scope,

treating the entity as a single client for the purpose of the exemption would frustrate Congress's policy. If Congress did intend the exemption to prevent regulation only of small-scale operations – a policy goal that is clear from neither the statute's text nor its legislative history – the Commission's rule bears no rational relationship to achieving that goal. The number of investors in a hedge fund – the "clients" according to the Commission's rule – reveals nothing about the scale or scope of the fund's activities. It is the volume of assets under management or the extent of indebtedness of a hedge fund or other such financial metrics that determines a fund's importance to national markets. One might say that if Congress meant to exclude regulation of small operations, it chose a very odd way of accomplishing its objective – by excluding investment companies with one hundred or fewer investors and investment advisers having fewer than fifteen clients. But the *Hedge Fund Rule* only exacerbates whatever problems one might perceive in Congress's method for determining who to regulate. The Commission's rule creates a situation in which funds with one hundred or fewer investors are exempt from the more demanding Investment Company Act, but those with fifteen or more investors trigger registration under the Advisers Act. This is an arbitrary rule.

* * *

The petition for review is granted, and the *Hedge Fund Rule* is vacated and remanded.

*So ordered.*