RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                   *Plaintiff-Appellee,*

    *v.*

MARK D. LAY,

                   *Defendant-Appellant.*

No. 08-3892

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-00339-001—David D. Dowd, District Judge.

Argued: April 27, 2010

Decided and Filed: July 14, 2010

Before: GIBBONS, ROGERS, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael L. Cioffi, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Antoinette T. Bacon, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael L. Cioffi, Nathaniel R. Jones, Rachel L. Payne, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Antoinette T. Bacon, Laura McMullen Ford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

    ROGERS, J., delivered the opinion of the court, in which GIBBONS, J., joined. KETHLEDGE, J. (pp. 12-13), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

    ROGERS, Circuit Judge. Defendant Mark D. Lay appeals his fraud convictions related to a hedge fund investment by the Ohio Bureau of Workers' Compensation. Lay primarily argues that the jury instructions were improper and that insufficient evidence

supports the jury's verdict because, as a hedge fund adviser, Lay had a fiduciary relationship only with the hedge fund, not with its investors. Lay also seeks a new trial based on three of the district court's evidentiary rulings and its restitution and forfeiture determinations. Because a hedge fund adviser can, in some circumstances, have a fiduciary relationship with an investor, the jury instructions were correct and sufficient evidence supports Lay's conviction. We also reject Lay's challenges to the district court's evidentiary rulings and its restitution and forfeiture determinations.

## I. Background

The facts of this case—based on the indictment and the evidence presented by the Government in support of the allegations in the indictment—are set out in careful detail in the district court's opinion denying Lay's motion for judgment of acquittal. *United States v. Lay*, 566 F. Supp. 2d 652, 655-68 (N.D. Ohio 2008). A brief summary is sufficient here. In 1992 Lay began serving as investment adviser to the Ohio Bureau of Workers' Compensation when Lay's company, Capital Management, Inc., began managing the Bureau's investment in a long-term bonds fund, the Long Fund. The Bureau remained Lay's client as to its Long Fund investment from 1992 onward. In 1998, Lay founded the Active Duration Fund, a hedge fund. In September of 2003, the Bureau shifted $100 million from the Long Fund to the Active Duration Fund. The hedge fund agreement governing the Bureau's Active Duration Fund investment set a non-binding 150% leveraging guideline, but in fact Lay consistently leveraged Active Duration Fund assets far over 150%. In March of 2004, the Active Duration Fund lost $7 million. In May of 2004, after Bureau officials discussed the loss with Lay, the Bureau invested an additional $100 million in the Active Duration Fund. The Active Duration Fund's value continued to decline. In September of 2004, the Bureau invested an additional $25 million in that fund to avoid losing its entire investment, and then terminated its interest in the fund. The Bureau recovered only about $9 million from its $225 million Active Duration Fund investment.

A federal grand jury indicted Lay on one investment adviser fraud count and multiple mail and wire fraud counts. The investment adviser fraud count tracked the following Investment Advisers Act provisions, codified at 15 U.S.C. § 80b-6, which make it unlawful for an investment adviser to use the mails or the instrumentalities of interstate commerce

> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> . . . .
> (4) to engage in any act, practice or course of business which is fraudulent, deceptive, or manipulative.

The Superseding Indictment charged that Lay acted to:

> (a) employ devices, schemes, and artifices to defraud, the client, the [Bureau] and thereby the [Active Duration Fund]; (b) engage in transactions, practices and courses of business which operated as a fraud and deceit upon, the client, the [Bureau] and thereby the [Active Duration Fund]; and (c) engage in any act, practice and course of business which was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in the [Active Duration Fund], in violation of the [hedge fund agreement], and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%.

The Superseding Indictment also alleged that Lay's conduct constituted mail fraud and wire fraud because Lay sent interstate emails, faxes, and trade confirmations to carry out these trades.

At trial, Terry Gasper, the Bureau's Chief Financial Officer and the person who initially decided to invest Bureau money in the Active Duration Fund, testified that his "understanding [of the Active Duration Fund and Long Fund investments] was that if Mr. Lay felt that bond prices in general were going to decline . . . the [Active Duration Fund] would be used to hedge those bonds . . . so that if the bond market did, in fact, go down in value, we would make some money in the [Active Duration Fund] to offset the . . . unrealized losses we would have suffered in [the Long Fund]." Gasper indicated that his experience with Lay and the Long Fund was "one of the primary reasons" he invested in the Active Duration Fund, that he felt the Active Duration Fund investment was "very conservative" and "low risk," and that the Bureau was "simply diversifying the product under a current manager" when it invested Long Fund assets already under Lay's management in the Active Duration Fund. Gasper testified that in the first half of 2003, before the Bureau invested in the Active Duration Fund, Lay told Gasper that the Active Duration Fund "would be using leverage only to reflect the value of what he had in the fund" and that Gasper had viewed the 150% leveraging guideline in the hedge fund agreement as

"a way to give [Lay] some flexibility in running money and moving monies around." Gasper testified that when the Bureau had invested a second $100 million in the Active Duration Fund, he had assumed that Lay was acting in "an appropriate fiduciary way . . . that the leverage in the [Active Duration Fund] was exactly what we agreed to, that maximum of 150 percent of fund value."

James McLean, the Bureau's Chief Investment Officer, testified that he and Lay had agreed in April of 2004, after the initial $7 million loss and before the second $100 million investment, that "the fund was . . . intended to be more of a net positive rate of return fund . . . [meaning] that [Lay is] investing in high quality fixed income securities, and if they're yielding a rate of return of say five percent on an interest bearing basis, then that fund, all things being equal and nothing else being done, would earn a five percent rate of return." As to leverage, McLean testified that he and Lay agreed that the Active Duration Fund was "allowed to use a bit of leverage to take positions to enhance that five percent rate of return when [Lay saw] opportunities within the marketplace," but that with this "modest" leverage, "even if that account were to lose a little bit based upon the leveraging of a bet that [Lay] placed on the short position . . . you still earn one or two percent based upon the core of the hedge fund portfolio." Lay had regularly reported to McLean in writing regarding the Long Fund's performance, and these reports had included a one-line summary of the Active Duration Fund's value under the heading "other assets."

FBI Special Agent Jeremy Durgin testified that, of the Bureau's $214 million total loss, approximately $212 million was due to trades that had leveraged Active Duration Fund assets over 150%. Durgin testified that Lay had begun leveraging those assets over 150% in early 2004, that two-thirds of Lay's Active Duration Fund trades involved leveraging over 150%, that over one-fifth of those trades involved leveraging over 1000%, and that some trades involved leveraging over 10,000%.

Over Lay's objection, the district court also permitted the jury to hear Lay's deposition testimony from a previous civil case. In that deposition, Lay repeatedly stated that his company, Capital Management, Inc., "was the investment adviser for the [Active Duration Fund]" and "provided a service to the [Active Duration Fund]." Lay also stated

in that deposition that the Bureau was Capital Management, Inc.'s "client" and that "the Bureau, as a client, pays the fees."

The district court instructed the jury that, in order to find Lay guilty of investment adviser fraud, the Government had to prove "*each* element of *either* [15 U.S.C. §] 80b-6(1) *or* 80b-6(2) *or* 80b-6(4)."  566 F. Supp. 2d at 692 (emphasis in original).  With respect to §80b-6(1) & (2), the court instructed that

> In order to [establish that Lay committed investment adviser fraud under these provisions], the government must prove beyond a reasonable doubt that the [Bureau] was Mark Lay's client with respect to its investment in the . . . Active Duration Fund. . . .
> A client is an individual or entity which compensates an investment adviser to provide advice directly or through publications or writings about the value of securities or the advisability of investing in, purchasing, or selling securities. . . .
> It is for you to determine as a matter of fact whether Mark Lay had an investment adviser-client relationship with the [Bureau] with respect to its investment in the . . . Active Duration Fund. There are two possible outcomes of your determination on this issue.
> First, you could find that the government failed to prove beyond a reasonable doubt that Mark Lay had an investment adviser-client relationship with the [Bureau] with respect to its investment in the . . . Active Duration Fund.
> Second, you could find that the government [has] proved beyond a reasonable doubt that Mark Lay did have an investment adviser-client relationship with the [Bureau] with respect to the [Bureau's] investment in the . . . Active Duration Fund. You could make this finding in one of two ways. The Defendant does not dispute that he was the investment adviser and the [Bureau] was his client with respect to the Long Fund which continued throughout the period of time at issue in the Superseding Indictment. Therefore, you could find that: 1) Lay established a second investment adviser-client relationship with the [Bureau] and he was the investment adviser to the [Bureau] with respect to both the Long Fund and the . . . Active Duration Fund, or that 2) the investment adviser-relationship between Lay and the [Bureau] regarding the Long Fund was based on the investment of the monies in the Long Fund wherever it was invested and was not severed when Long Fund monies were invested in the . . . Active Duration Fund.

*Id.* at 694-95.

The court also instructed with respect to § 80b-6(4) that if the jury found that the Bureau was not Lay's client with respect to the Active Duration Fund, the jury was to

determine as a matter of fact whether Lay nonetheless had a fiduciary duty with regard to the Active Duration Fund. *Id.* at 696. The district court rejected Lay's objection to this instruction.

To find Lay guilty of mail or wire fraud, the district instructed the jury that it had to find beyond a reasonable doubt that (1) "there was a scheme to defraud;" (2) "[Lay] knowingly participated in the scheme;" (3) the scheme included a material representation or concealment of a material fact;" (4) "[Lay] had the intent to defraud;" and (5) "[Lay] used the mail or caused another to use the mail in furtherance of the scheme."

After deliberations began, the jury asked to rehear Lay's deposition testimony. The district court permitted a re-reading, but first cautioned the jury "not to accord undue influence to that testimony."

The jury found Lay guilty on all counts and found in a special verdict form that Lay had obtained $590,526.23 in proceeds from his mail and wire fraud offenses. Lay moved for judgment of acquittal and argued that insufficient evidence supported his convictions because he did not owe the Bureau a fiduciary duty and the Bureau was not his client as to its Active Duration Fund investment. Lay also moved for a new trial based on, among other reasons, alleged error in the district court's jury instructions and its limiting instruction upon the re-reading of Lay's deposition testimony, and cumulative error.

The district court denied Lay's motion for judgment of acquittal. The court held that sufficient evidence supported the existence of a fiduciary relationship between Lay and the Bureau as to its Active Duration Fund investment because Lay had a pre-existing fiduciary relationship with the Bureau as to its Long Fund investment, the Bureau intended its Active Duration Fund investment to "provide Lay with flexibility and investment management alternatives for half of the [Long Fund] monies in order to reduce the overall risk to the [Bureau] monies under Lay's control," the Bureau was not a passive investor in the Active Duration Fund, the Bureau had "regular and direct" communication with Lay about the Active Duration Fund, and the Bureau was the sole shareholder in the Active Duration Fund. 566 F. Supp. 2d at 670-71. The district court denied Lay's motion for judgment of acquittal as to the mail and wire fraud counts. *Id.* at 671 n.56. The district court also denied Lay's motion for a new trial and held that the jury instructions were proper, that the court had

issued a proper limiting instruction before Lay's deposition testimony was re-read to the jury, and that no cumulative error had occurred. *Id.* at 672, 677-78, 678-79. The district court directed that $590,526.23 be forfeited and imposed $212 million in restitution. On appeal, Lay challenges the district court's jury instructions and its denial of his motions for judgment of acquittal and a new trial.

## II. Jury-instruction and sufficiency-of-the-evidence challenges

### A. Investment adviser fraud

Lay's central argument is that, as to the hedge fund, he owed no fiduciary duty to the Bureau. The duty of a hedge fund adviser, the theory goes, is to the hedge fund and cannot be to the various investors in the fund. If the theory is correct, then various instructions to the jury, permitting the jury to find such a fiduciary duty, were in error and, indeed, acquittal should have been ordered. The theory fails, however, for the reasons carefully stated by the district court below. *Id.* at 668-71. Permitting the jury to determine the existence of a fiduciary relationship was proper and, on the facts of this case, a reasonable jury could find that Lay owed the Bureau a fiduciary duty with respect to the Active Duration Fund. Lay's challenges to the jury instructions and to the denial of the acquittal motion in this regard are therefore both without merit.

As explained by the district court, "there is evidence in the record that the characteristics of an adviser-client relationship were present between defendant and the [Bureau] regarding the [Active Duration Fund]." *Id.* at 670. Lay has never disputed that he had an investment adviser-client relationship—and therefore a fiduciary relationship—with the Bureau as to its Long Fund investment, and the evidence supports the conclusion that this relationship continued through the existence of the Active Duration Fund and encompassed the Bureau's Active Duration Fund investment. As Gasper testified, the Bureau invested in the Active Duration Fund to diversify existing investments, achieve positive returns regardless of market conditions, and increase returns above those the Bureau could achieve with the Long Fund alone. Capital Management, Inc.'s inclusion of the Active Duration Fund as "other assets" in its Long Fund reports indicates that the Active Duration Fund and the Long Fund were part of a single investment strategy and therefore part of the Bureau's single relationship with Lay. Unlike a typical hedge fund investor, the Bureau was the only

investor in the Active Duration Fund at the relevant time and the Bureau had an active role in its Active Duration Fund investment, as indicated by McLean's meetings with Lay regarding that investment. The jury could therefore reasonably find, as a matter of fact, that Lay owed the Bureau a fiduciary duty as to the Active Duration Fund investment.

Lay's categorical argument to the contrary is primarily based upon reading too much into the holding of the District of Columbia Circuit in *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006), regarding the Investment Advisers Act (IAA). That case precluded the Securities and Exchange Commission from treating all hedge fund investors as clients of a hedge fund adviser for purposes of circumventing a small-dealer registration exemption. The case did not hold that a hedge fund investor could never be a client of a hedge fund adviser, or be owed a fiduciary duty by one, for purposes of the criminal fraud provisions of the IAA.

In *Goldstein*, the D.C. Circuit considered an SEC rule change related to the IAA registration exemption for investment advisers with fewer than fifteen clients in the past twelve months. *See id.* at 874. Under the SEC's prior rule, a hedge fund adviser's client for registration purposes was the fund, not the fund's investors. *Id.* at 876. Under the SEC's new rule, however, a hedge fund adviser's clients would include the fund's investors. *Id.* at 877. The court held that the SEC had not "adequately explained how the relationship between hedge fund investors and advisers justifies treating the former as clients of the latter" and vacated the new rule. *Id.* at 882. The court reasoned that, based on the IAA's definition of "investment adviser," a client relationship results when the investor receives investment advice directly from the adviser, and because hedge fund investors do not always receive direct investment advice from hedge fund advisers, the IAA does not support treating all hedge fund investors as clients of hedge fund advisers. *Id.* at 879. As the court stated, "[a hedge fund adviser] does not tell the *investor* how to spend his money; the investor made that decision when he invested in the [hedge] fund. Having bought into the fund, the investor fades into the background; his role is completely passive." *Id.* at 879-80.

*Goldstein* did not hold that no hedge fund adviser could create a client relationship with an investor, but rather held only that the SEC had "not justified treating *all* investors in hedge funds as clients." *Id.* at 883. The court noted that hedge funds are "usually structured as limited partnerships to achieve maximum separation between ownership and

management" and that "the general partner manages the fund . . . for a fixed fee and a percentage of the gross profits from the fund" while "[t]he limited partners are passive investors and generally take no part in management activities." *Id.* at 876. The court acknowledged that "different classes of investors [may] have different rights or privileges with respect to their investments" and that "[i]f . . . certain characteristics present in some investor-adviser relationships . . . mark a 'client' relationship, then the [SEC] should have identified those characteristics and tailored its rule accordingly." *Id.* at 882-83. It was therefore entirely consistent with *Goldstein* for the district court in Lay's case to permit the jury to find as fact that Lay owed the Bureau a fiduciary duty with respect to the Active Duration Fund. The jury's finding that Lay was guilty of investment adviser fraud is also consistent with *Goldstein* because the relationship between the Bureau and Lay as to the Active Duration Fund was not a typical hedge fund adviser-investor relationship.

This disposes of the bulk of Lay's arguments on appeal. Lay also argues that the 150% limit on leveraging served only as a guideline rather than a binding limitation. However, the leeway contemplated by the leveraging guideline's non-binding nature does not permit leveraging over 150% in two-thirds of trades and leveraging over 1,000% in one-fifth of trades. Therefore, the district court's jury instructions fairly and adequately submitted the issues and applicable law to the jury, *United States v. Mick*, 263 F.3d 553, 569 (6th Cir. 2001) (standard), and, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found Lay guilty of investment adviser fraud based on his misrepresentation of or failure to disclose his leveraging activity to his client, the Bureau, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (standard).

**B. Mail and wire fraud**

Sufficient evidence also supports the jury's determination that Lay is guilty of mail and wire fraud. The evidence establishes that Lay used interstate mail or wires in furtherance of a scheme or artifice to defraud with intent to deprive the Bureau of money when he misrepresented to the Bureau the extent of his overleveraging and omitted material information in his reports to the Bureau. *See United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000) (elements of the offense). When Gasper invested Bureau money in the Active Duration Fund, he believed the investment was conservative because Lay had

represented that he would leverage based on the 150% guideline, and Gasper increased the Bureau's Active Duration Fund investment based on the same belief; therefore, Lay's misrepresentations of his leveraging activity caused the Bureau to part with money. The trade confirmations, emails, and faxes through which Lay conducted the fraud satisfy the mailing and wiring requirements because these documents "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003). Therefore, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found Lay guilty of mail and wire fraud.

Moreover, the district court's jury instructions on mail and wire fraud were also proper, and—for the reasons set out above with regard to the IAA—the district court properly declined to instruct the jury that, as a matter of law, Lay owed the Bureau no fiduciary duty and that Lay therefore could not be convicted of mail and wire fraud.

### III. New trial motion

Lay is not entitled to a new trial because the three challenged evidentiary rulings were correct, the district court correctly determined restitution and forfeiture, and no cumulative error occurred.

The record belies Lay's contention that the Government consistently called the Bureau Lay's "client" at trial or interchanged the words "investor" and "client." Lay's own counsel, during cross-examination of a Bureau official, solicited the most significant discussion of this nature. Lay cannot complain about the discussion elicited by his own counsel, and other isolated references to the Bureau as Lay's client as to its Active Duration Fund investment do not warrant a new trial.

Lay's deposition testimony from a previous case was admissible non-hearsay because it is an admission by a party-opponent, Fed. R. Evid. 801(d)(2); *see United States v. Moffie*, 239 F. App'x 150, 156-57 (6th Cir. 2007), and the deposition was not rendered inadmissible because Lay opined therein that the Bureau was his client. A lay witness may testify to a legal conclusion that "does not involve terms with a separate, distinct and

specialized meaning in the law different from that present in the vernacular." *United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir. 1995). Because "client" does not have a separate, distinct, and specialized meaning in the law different from its meaning in the vernacular, the district court correctly permitted the jury to hear Lay's deposition and Lay was not entitled to a new trial on this basis.

Before permitting the re-reading of Lay's deposition testimony, the district court properly cautioned the jury "not to accord undue influence to that testimony." Lay's additional requested instruction, that the jury was not to take the testimony out of context, was unnecessary because the entirety of Lay's deposition testimony was re-read to the jury. In *United States v. Epley*, 52 F.3d 571, 579 (6th Cir. 1995), we ruled that a district court had not abused its discretion in re-reading testimony to a jury, reasoning in part that the danger of the jury's taking the testimony out of context was not present because the jury re-heard the entire testimony of the witness. Therefore Lay was not entitled to a new trial based on the district court's refusal to instruct the jury not to take the re-read deposition testimony out of context.

The district court correctly ordered that $590,526.23 be forfeited based on the amount the jury found to represent or to be traceable to proceeds that Lay obtained from his mail and wire fraud. *See* 18 U.S.C. §§ 981, 982. The district court also properly imposed $212 million in restitution because this amount reflects the Bureau's losses due to Lay's over-leveraging of Active Duration Fund assets. As we held in *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005), such "restitution orders are not affected by the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the restitution statutes do not specify a statutory maximum." Therefore, Lay was not entitled to a new trial on this basis.

Finally, because Lay's individual claims of error fail, Lay was not entitled to a new trial based on cumulative error.

## IV. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part. I join all but part II.B of the court's opinion. I dissent from that part because I do not think the government proved a case of mail fraud.

That is not to say it could not have. The government had ample proof that Lay defrauded the Bureau by misrepresenting his intentions with respect to the 150% leverage limitation, and that he did so in order to induce the Bureau to part with its money. The only remaining element of mail fraud was an interstate mailing "in furtherance of the scheme[.]" *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000); *see also* 18 U.S.C. § 1341 (a mailing must be "for the purpose of executing such scheme or artifice" to defraud). Given the abundance of proof as to Lay's misrepresentations generally, one might expect simply to see proof that one of them was mailed.

But we do not see that. Instead, the charged mailings are "trade confirmation slips," which one bank mailed to another as a result of trades that Lay authorized for the Active Duration Fund. No one contends that the slips themselves contained any misrepresentations or that they played any role whatever in parting the Bureau from its money. Instead, the slips simply confirmed trades that Lay had made on the open market. The question, then, is whether the government proved the slips somehow furthered the fraud.

The government's explanation of this point is amorphous at best. It observes, correctly, that post-fraud mailings can further the scheme if "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane*, 474 U.S. 438, 451 (1986) (internal quotation marks omitted); *see also* Majority Op. at 10. The government contends the slips had this effect because they ensured that the Fund would not be assessed a five-percent penalty for failed trades. Had those penalties been assessed, the government says, Lay would have "lost [the Bureau's] confidence and business." Gov't Br. at 52. The government's explanation more or less trails off there; but we are left to infer, apparently, that had the Bureau lost confidence in Lay, it

would have begun asking questions, whose answers might have led to still other questions, which in turn could have uncovered the fraud. So, in the government's view, the slips furthered the scheme.

The question is one of degree. In my view, the bank slips were too remote from the antecedent fraud, and too speculative in their effects, to support a finding that they were "designed to lull the victims into a false sense of security[.]" *Lane*, 474 U.S. at 451. If the slips here were so designed, so too were Lay's annual submissions to the SEC to retain his status as a registered investment advisor, *see* 17 C.F.R. § 275.204-1; since absent that status the Bureau surely would have lost confidence in him. That is an awfully broad conception of mailings in furtherance of the fraudulent scheme. At some point the element exists only in theory, rather than in fact.

That said, I agree with the majority's affirmance of Lay's conviction for conspiracy to commit mail fraud and wire fraud. On that charge, the government did identify an overt act that concealed the fraudulent scheme from the Bureau. And my agreement on the conspiracy charge means that, even under my proposed disposition of this case, Lay's sentence would remain the same. The district court sentenced Lay to 60 months for the investment-adviser conviction, and 144 months for each of the other convictions—including the conspiracy one—with all sentences running concurrently. Even absent the mail-fraud convictions, therefore, Lay's sentence would be 144 months. Thus, while I respectfully dissent from the majority's affirmance of Lay's mail-fraud convictions, I join its affirmance of his sentence.

But my point, in closing, remains a practical one: The government would make its task easier in mail- and wire-fraud cases if it would choose, as its charged communication, a blood relative of the fraud, rather than a second cousin by marriage. Reasonable jurists can disagree as to the outcome in cases like this one. But one wonders why they should have to.

For these reasons, I concur in part and dissent in part.