**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Paul T. MANNION, Jr., Andrew S. Reckles, PEF Advisors Ltd., and PEF Advisors LLC, Defendants,**

**Palisades Master Fund, L.P., Relief Defendant.**

**No. 1:10–cv–3374–WSD.**

United States District Court, N.D. Georgia, Atlanta Division.

June 2, 2011.

---

Adam S. Aderton, David Williams, Julie M. Riewe, Robert B. Kaplan, Scott W.

Friestad, Securities and Exchange Commission, Washington, DC, Madison Graham Loomis, Securities & Exchange Commission, Atlanta, GA, for Plaintiff.

Matthew B. Bowman, Richard James Mitchell, Stavroula E. Lambrakopoulos, Stephen J. Crimmins, K & L Gates, Washington, DC, Ross A. Albert, Morris Manning & Martin, Atlanta, GA, for Defendants.

## OPINION AND ORDER

WILLIAM S. DUFFEY, JR., District Judge.

This matter is before the Court on Paul T. Mannion, Jr. ("Mannion"), Andrew S. Reckles ("Reckles"), PEF Advisors Ltd., and PEF Advisors LLC's (collectively, "Defendants") Motion to Dismiss [18] the Complaint [1] filed by Plaintiff Securities and Exchange Commission ("SEC"), and on Defendants' Motion for Oral Argument [19]. For the reasons set forth below, the Court denies both motions.

## I. BACKGROUND

The Court relies on the factual allegations in the SEC's Complaint and accepts those allegations as true. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir.2010).

### A. *The Defendants*

Defendants Mannion and Reckles were, during the time periods relevant to this lawsuit, the principals and co-owners of Defendants PEF Advisors LLC and PEF Advisors Ltd. (Compl. ¶¶ 14, 15). PEF

Advisors LLC is a Delaware limited liability company that is the general partner of, and investment adviser for, Palisades Equity Fund, L.P., a "feeder" hedge fund. (*Id.* ¶ 17; *see also* Palisades Equity Fund, L.P. Confidential Offering Memorandum ("Offering Memo"), Defs.' Br. Supp. Mot. Dismiss ("Mot. Dismiss Br.") Decl. Ex. 1). PEF Advisors Ltd. is a British Virgin Islands international business company and is the manager of, and investment adviser for, Palisades Equity Holdings, Ltd., also a "feeder" hedge fund. (Compl. ¶ 16; *see also* Palisades Equity Holdings Ltd. Confidential Private Placement Memorandum ("Placement Memo"), Mot. Dismiss Br. Decl. Ex. 2[1]).

The two feeder hedge funds invest in and through the "master" hedge fund, Relief Defendant Palisades Master Fund, L.P. (the "Fund"). (Compl. ¶ 18). PEF Advisors LLC is also the General Partner of, and investment advisor, for the Fund. (Offering Memo 6).[2]

### B. *The Overvaluation Allegations*

The crux of the SEC's Complaint relates to the Fund's investments in World Health Alternatives, Inc. ("World Health"), which declared bankruptcy on February 20, 2006, and the Defendants' representations about the value of the Fund's World Health investments in the aftermath of revelations in August 2005 of misconduct and fraud by top World Health executives. (Compl. ¶¶ 19, 21–62).

---

1. Defendants attached the Offering Memo and Placement Memo to their Motion to Dismiss. The Complaint references the memos, (Compl. ¶¶ 41–43), and they are central to the SEC's claims. The Court therefore deems it appropriate to consider the documents for the purposes of the Motion to Dismiss. *See Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1369 (11th Cir.1997).

2. The Complaint and the parties' arguments focus on the relationship between Defendants and the master Fund, and on Defendants' duties as advisors to the Fund. For the purposes of this Order the Court, therefore, does not consider what effect, if any, the feeder funds may have on the advisory duties or liabilities of the Defendants and treats the separate hedge fund entities as essentially constituting a single fund.

### 1. The Fund's Investments In World Health

Beginning in August 2004, and continuing until August 2005, the Fund, at the direction of Mannion and Reckles, invested millions of dollars in World Health, a now-bankrupt medical staffing company that was based in Pittsburgh, Pennsylvania. (Compl. ¶ 21). By July 2005, World Health was the Fund's largest single investment and made up at least 20% of the Fund's assets. (*Id.*).

On August 15, 2005, World Health's CEO abruptly failed to attend a conference call with investors and analysts. (Compl. ¶ 23). The next day, World Health announced the CEO's resignation amidst revelations of financial irregularities at the company. (*Id.* ¶ 24). In response, World Health's secured lender immediately halted all lending to the company, which World Health relied upon to meet its operating expenses. (*Id.* ¶ 25). To meet this need, the Fund loaned World Health $4 million in bridge financing to be repaid by August 31, 2005. (*Id.* ¶ 25). On August 24, 2005, the Fund provided World Health with a second bridge loan, also to be repaid by August 31, 2005.

Also on August 24, Reckles sent an e-mail to a World Health executive with the subject "Help Us." Reckles stated in the e-mail that the Fund needed World Health to issue additional stock to the Fund because otherwise the Fund "was going to take a MASSIVE loss this month." (Compl. ¶ 28 (quoting Reckles's email)). Reckles acknowledged that the Fund's World Health stock holdings had already lost $3.9 million, and said that Mannion and Reckles "were going to show such a HUGE loss to our investors that we fear large scale redemptions and this could cause the end of our fund...." (*Id.* ¶ 28 (quoting Reckles's e-mail) (ellipsis in original)).

On August 29, 2005, while World Health was trying to secure a new round of financing, Reckles stated in another e-mail that the new financing deal "MUST close by August 30 or 31 or the company will probably fail." (Compl. ¶ 31 (quoting Reckles's e-mail)). The new round of financing did not close by August 31, 2005. (*Id.*).

From August 15, 2005, through August 31, 2005, the price of World Health's unrestricted common stock declined from $3.46 a share to $0.22 per share, a drop of more than 93%. (Comp.¶ 33). On August 31, 2005, World Health was unable to repay the $6 million in bridge financing provided by the Fund and went into default on the debt. (*Id.* ¶ 32).

According to the SEC, Mannion and Reckles feared that reporting the Fund's substantial losses on its World Health investments would cause investors to withdraw their investment in the Fund. (Compl. ¶ 34). Due to the Fund's heavy investment in illiquid securities, the Fund would not have had sufficient cash to redeem investments if a large number of investors sought redemption. (*Id.*).

### 2. The Side–Pocket Letter

On September 8, 2005, Mannion and Reckles sent a letter to the Fund's investors describing the events at World Health and seeking consent to put the Fund's World Heath investments in a "side pocket." (Mot. Dismiss Br. Decl. Ex. 3 ("Side Pocket Letter")[3]). The SEC describes a side pocket as

> a mechanism that hedge funds use to separate typically illiquid investments

---

**3.** The Complaint references and quotes the Side Pocket Letter, (Compl. ¶ 36), and the letter is central to the SEC's claims. The Court therefore deems it appropriate to consider the letter for the purposes of the Motion to Dismiss.

from the more liquid investments in the fund. In the event a fund investor wishes to redeem his or her investment in a hedge fund with a side pocket, the investor typically will not be permitted to redeem the pro-rata portion of the investment in the fund that was allocated to the side pocket until the asset is liquidated and/or the fund advisers decide to release the assets from the side pocket.

(Compl. ¶ 35).

The letter stated: "At this point, we have a total investment of approximately $19.72 million [sic] in World Health. Of this amount, $6 million [sic] represents funding we have advanced to the company over the past two weeks to satisfy payroll, $9.6 million [sic] in Convertible Debenture and $4.12 million [sic] in free trading and restricted common stock." (Side Pocket Letter 2). The SEC alleges it was misleading to describe the "total investment" as $19.72 million because Defendants knew the assets at that time were worth significantly less. Using the market quote for the Fund's World Health stock would have yielded a value of $362,000 instead of $4.12 million. The letter also did not disclose that World Health had defaulted on the $6 million bridge loan. Finally, the SEC claims the letter misled Fund investors by not disclosing that Mannion and Reckles had both sold the majority of their personal holdings of World Health unrestricted common stock on August 26, 2005, soon after World Health's financial problems began. (Compl. ¶¶ 29, 36).[4]

The Fund's investors agreed to allow Defendants to place the World Health investments into a side pocket (the "Side Pocket"). Even though the Side Pocket prevented Fund investors from redeeming their pro rata share of the Fund's World Health holdings, Defendants still feared,

according to the SEC, that the World Health Side Pocket had lost enough value to show up as a massive overall loss by the entire Fund, which could have triggered large-scale redemptions of non-Side Pocket investments from the Fund. (Compl. ¶ 38).

*3. Monthly Net Asset Value Statements*

Each month, Mannion and Reckles determined a Net Asset Value ("NAV") for the Fund's investments and made the NAV statement ("NAV Statement") available to Fund investors and to potential new investors. (Compl. ¶¶ 40, 60). The purpose of the NAV Statement was to communicate Fund performance to Fund investors and to calculate Defendants' management fees. (*Id.* ¶ 40). The Fund's policies required Defendants to use certain methods to value different categories of assets, usually based on the market value of the asset or a related asset. (*Id.* ¶ 41). If, however, Defendants determined that the Fund's prescribed method resulted in an asset valuation that did not represent fair value, they were required to inform the Fund's directors so that a reasonable value could be determined. (Compl. ¶ 43).

On September 13, 2005, Defendants began creating the August 2005 NAV for the Side Pocket, which they finalized the next day to represent a total value of $15.3 million. (Compl. ¶¶ 46, 55–56). The SEC alleges that the August 2005 NAV was misleading because it valued several classes of World Health securities significantly higher than they should have been valued under the Fund's prescribed valuation methodology. According to the SEC, the value of the Fund's World Health restricted stock was $0 under the Fund's prescribed valuation methodology, but Mannion and Reckles valued it at $1.9

---

**4.** The day after sending the letter to Fund investors, Mannion and Reckles both sold

their remaining World Health shares. (Compl. ¶ 37).

million. (*Id.* ¶ 48). Similarly, the convertible debenture had a value of $3.4 million under the prescribed valuation methodology, but Mannion and Reckles valued it at $7.4 million. (*Id.* ¶ 49). Although the Fund's valuation policy required Defendants to value loans at cost—as Defendants did—the SEC alleges that Mannion and Reckles knew that the $6 million bridge loan to World Health was not reasonably valued at $6 million because the loans went into default on the last day of August 2005 and thus were unlikely to be repaid in full. (*Id.* ¶ 50). Finally, the SEC alleges that the August NAV was intentionally misleading because it conflicted with Defendants' internal assessment of the Side Pocket's value, as shown in a spreadsheet Mannion sent to the Fund administrator the day before finalizing the August NAV. (*Id.* ¶¶ 54–56). On September 13, 2005, the spreadsheet that Mannion e-mailed valued the World Health Side Pocket at $9.4 million, while a day later Defendants finalized the August NAV showing the investment was worth $15.3 million, an increase of 60%. (*Id.* ¶¶ 54–55).

The SEC also alleges that the September and October NAV Statements that Mannion and Reckles created were misleading. Defendants continued to assign the Fund's convertible debenture a value of $7.4 million when, according to the SEC, it had a maximum value of $3.4 million. (Compl. ¶ 49). Defendants also continued to value the $6 million bridge loan at full value, despite knowing that the loan was in default and that Mannion and Reckles had filed suit against World Health on the Fund's behalf in September 2005 seeking repayment of the loan. (*Id.* ¶ 51–52). Defendants did, however, reduce the value of the Fund's World Health restricted common stock to zero. (*Id.* ¶¶ 47–52; Mot. Dismiss Br. 8).

Mannion and Reckles received a management fee from the Fund based on the Fund's total Net Asset Value. (Compl. ¶ 59). The SEC alleges that by giving misleadingly high valuations for the World Health Side Pocket, Mannion and Reckles were able to improperly inflate their management fee. (*Id.*).

Defendants also distributed the allegedly inflated NAV Statements to potential new investors they solicited. During that time period, one new investor joined the Fund with a $3 million investment. (Compl. ¶ 60).

In November 2005, Mannion and Reckles sold the Fund's unrestricted common stock at prices ranging from $0.10 to $0.14 per share, down from $3.46 per share the day before World Health's former-CEO abruptly resigned. (Compl. ¶¶ 33, 37). Mannion and Reckles had by that time valued the Fund's holdings of World Health restricted common stock at $0. In February 2006, World Health declared bankruptcy. (*Id.* ¶ 61). As of the bankruptcy filing, Mannion and Reckles valued the Fund's remaining World Health investments—and thus the entire World Health Side Pocket—at $0. (*Id.* ¶ 62).

## C. *The Misappropriation Allegations*

The SEC alleges that Mannion and Reckles misused assets belonging to the Fund on three occasions. (Compl. ¶ 63). In August 2005, the Fund owned warrants that entitled it to purchase 1.04 million shares of World Health common stock. (*Id.* ¶ 64). Before World Health's CEO abruptly resigned in mid-August and World Health began its slide into bankruptcy the warrants had significant value. On August 7, 2005, Mannion and Reckles, using their personal funds on their own behalf, exercised the warrants belonging to the Fund. (*Id.*). When they received the shares on August 12, 2005, Mannion and Reckles had an unrealized profit of $1.6 million from their unauthorized exercise of

the warrants. (*Id.* ¶¶ 64–65). The implosion of World Health's stock price that began the next trading day prevented Mannion and Reckles from realizing their profit on the transaction and instead caused them to lose money. (*Id.* ¶ 66).[5]

The second act of misappropriation occurred in July 2005, when Mannion and Reckles borrowed $2 million from the Fund to finance a personal investment. (Compl. ¶ 67). They promptly repaid the loan, but the SEC alleges that the Fund's governing documents did not authorize the loan and that the loan was never disclosed to investors. (*Id.*).

Finally, the SEC alleges that in July 2005, Mannion and Reckles improperly borrowed $13,000 from the Fund to pay for services provided to Defendants and to purchase warrants for the benefit of Mannion and Reckles, rather than the Fund. (Compl. ¶ 68). Although Mannion and Reckles repaid the loan, the SEC alleges that Fund policies did not authorize the loan and that Mannion and Reckles never disclosed the loan to the Fund's investors. (*Id.*).

#### D. *The PIPE Transaction Misrepresentation Allegations*

The SEC's final allegations against Defendants involve a "private investment in public equity" transaction, commonly referred to as a PIPE transaction.[6] (Compl. ¶¶ 70–71). On February 5, 2004, a banker from Roth Capital Partners ("Roth") contacted Mannion about a PIPE transaction

(the "PIPE Transaction") being offered by Radyne Corporation ("Radyne"). (*Id.* ¶¶ 71–72). Before he disclosed the details of the transaction, the Roth banker required Mannion to agree not to trade in the issuer's shares and not to discuss the PIPE Transaction with others until it was publicly announced. (*Id.* ¶¶ 73–74). Mannion agreed to the conditions and the Roth banker disclosed to Mannion the details of the PIPE Transaction. (*Id.* ¶¶ 75–76). On February 5 and 6, 2006, despite Mannion's agreement not to trade in Radyne shares, the Fund sold short 60,000 shares of Radyne unrestricted common stock. (Compl. ¶ 80).

On February 12, 2004, "at the Defendants' direction, an authorized signatory for the Fund executed a stock purchase agreement," which was required to be signed by the seller of the Radyne stock before the Fund could participate in the PIPE Transaction. (Compl. ¶ 81). By signing the Stock Purchase Agreement ("SPA"), the signer represented that the Fund "did not hold a short position, directly or indirectly, in any shares of the Company's [Radyne's] stock." (*Id.* ¶ 82 (quoting SPA) (alteration in original)). That representation was false. (*Id.*). On February 14, 2004, Reckles faxed the signature pages of the stock purchase agreement to Roth on behalf of the Fund. (*Id.* ¶ 83). The SEC alleges that "Defendants defrauded the Radyne seller by making a material misrepresentation concerning their short position in the Radyne stock,"

---

**5.** Defendants argue that "[t]he situation was disclosed to the Fund's investors by Defendants who sold the shares at a loss and repaid the Fund." (Reply Mot. Dismiss 15). That statement of fact, however, conflicts with the Complaint's allegation that Mannion and Reckles "stole" the warrants, (Compl. ¶ 64), and the Court is required to accept the allegations in the Complaint as true. The term "theft" is not a conclusory label under the circumstances because it is clear from the

Complaint that the term is used for its everyday plain meaning to indicate that Defendants wrongfully and without authorization exercised the Fund's warrants for their personal benefit.

**6.** A PIPE transaction is an unregistered securities offering. The price of the underlying publicly-traded shares often decreases when the PIPE transaction becomes public.

which enabled them to make "substantial unlawful profits." (*Id.* ¶¶ 84–85).

### E. *Procedural Background*

The SEC filed its Complaint against Defendants on October 19, 2010. The Complaint brings three claims against Defendants. The first claim charges that Defendants' conduct described by the Overvaluation, Misappropriation, and Misrepresentation Allegations violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), implemented by SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). The second and third claims charge that Defendants' conduct described by the Overvaluation and Misappropriation Allegations violated Section 206(1) and (2) of the Investment Advisers Act ("Advisers Act"), 15 U.S.C. § 80b–6(1) ("Section 206(1)" and "Section 206(2)").

On January 20, 2011, Defendants filed the Motion to Dismiss that is presently before the Court.

## II. DISCUSSION

### A. *Legal Standard*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[ ] the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc.,* 626 F.3d 1187, 1196 (11th Cir.2010). Although reasonable inferences are made in Plaintiff's favor, "unwarranted deductions of fact in a complaint are not admitted as true." *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1260 (11th Cir. 2009) (internal quotation marks omitted). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true. *See id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 1951, 173 L.Ed.2d 868 (2009)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Mere "labels and conclusions" are insufficient. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). This requires more than the "mere possibility the defendant acted unlawfully." *Sinaltrainal,* 578 F.3d at 1261. "The well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud "must state with particularity the circumstances constituted fraud." Parties must plead "the who, what, when, where, and how" of the alleged fraud. *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir.2006). Conditions of a person's mind, however, such as intent and knowledge, "may be alleged generally." Fed.R.Civ.P. 9(b).

### B. *The Overvaluation Allegations*

The SEC claims that Defendants' alleged overvaluation of the Side Pocket violated Section 10(b) and Rule 10b–5, Section 206(1), and Section 206(2). Defendants argue that the Overvaluation Allegations do not adequately state a claim upon which relief can be granted under any of the three claims, and move to dismiss the allegations.

*1. Section 10(b) And Rule 10b–5*

■ Section 10(b) makes it "unlawful for any person … [t]o use or employ, in connection with the purchase or sale of any security …, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j. Rule 10b–5 makes it unlawful

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Under Section 10(b) and Rule 10b–5, the SEC must allege "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 766 & n. 17 (11th Cir.2007) (citing *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) & *SEC v. Zandford,* 535 U.S. 813, 816 n. 1, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)). Defendants urge that the Overvaluation allegations fail to adequately support all three requirements, and fail to allege fraud with the requisite particularity.

 a. The "In Connection With" Requirement

Section 10(b) and Rule 10b–5 forbid deceptive conduct "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Supreme Court has explained that in SEC enforcement actions, this requirement "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford,* 535 U.S. at 819, 122 S.Ct. 1899. Section 10(b) and Rule 10b–5 do not require "that there must be a misrepresentation about the value of a particular security," and it is enough that "the securities transactions and breaches of fiduciary duty coincide." *Id.* at 820, 825, 122 S.Ct. 1899.

Defendants argue the Complaint does not meet this requirement because the investors in the Fund did not "purchase or sell" shares of the Fund after receiving the allegedly inflated Side Pocket valuations. It is not enough, argue Defendants, that investors simply continue holding a stock. *See SEC v. Northshore Asset Mgmt.,* No. 05–civ–2192, 2008 WL 1968299, at *8 (S.D.N.Y. May 5, 2008) ("Under § 10(b), 'the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities.'" (quoting *Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977))).

The SEC argues that the "in connection with" requirement is satisfied by showing that Defendants made "assertions … in a manner reasonably calculated to influence the investing public." *SEC v. Huff,* 758 F.Supp.2d 1288, 1353 (S.D.Fla.2010) (quoting *SEC v. Tex. Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (en banc)). Under this theory, the alleged misrepresentation need only be a "public dissemination in a document … on which an investor would presumably rely," in which case the SEC only needs to prove the means of dissemination and the materiality of the alleged misrepresentation. *Id.* (quoting *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1362 (9th Cir.1993)). "[B]ecause such documents are designed to reach investors and to influence their decisions to transact in a

publicly-traded security," misrepresentations in publicly-disseminated statements about publicly-traded securities meet the "in connection with" requirement. *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).

█ The rule urged by the SEC—that showing that alleged misrepresentations were reasonably calculated to influence the investing public satisfies the "in connection with" requirement—does not apply in this case. The Complaint does not allege that the allegedly inflated Side Pocket valuations were publicly disseminated or that there was a public market for limited partnership stakes in the Fund. Nor is this a case where substantial trading activity occurred during the alleged misrepresentations, which might support the reasonable inference that the misrepresentations affected the purchase or sale of interests in the Fund. In this case, according to the Complaint, there was only one transaction. The SEC therefore cannot, on their Section 10(b) and Rule 10b–5 claim, rely on the distribution of the NAV Statements to existing Fund investors, because the alleged misrepresentations in those statements did not occur in connection with the purchase or sale of any security. *See Northshore*, 2008 WL 1968299, at *8; *see also SEC v. Clark*, 915 F.2d 439, 449 (9th Cir.1990) (requiring "some nexus between [the alleged fraud] and any securities transactions, because the fraud must somehow 'touch' upon securities transactions").

█ The SEC also alleges that Defendants "provided the inflated valuations in connection with their solicitation of new investors" and that "[o]ne new investor invested $3 million in the Fund." (Compl. ¶ 60). This alleged conduct satisfies the "in connection with" requirement because Defendants solicited a potential investor by providing that investor with an allegedly inflated NAV Statement, and the investor subsequently purchased an interest in the Fund. The misleading statement and the securities transaction "coincide," *Zandford*, 535 U.S. at 825, 122 S.Ct. 1899.

Defendants argue that the successful solicitation of a new investor fails to support a claim under Section 10(b) and Rule 10b–5 because the SEC does not state that Defendants provided the inflated valuations to that specific investor or that the new investor actually read the valuations. The allegation specifically states: "The Defendants also provided the inflated valuations in connection with their solicitation of new investors. One new investor invested $3 million in the Fund." Defendants interpret the Complaint to make two unrelated points: that the Defendants provided the inflated valuations to potential investors, and that a new investor invested in the Fund. The Court, however, understands the allegation to mean that Defendants provided the inflated Side Pocket values to potential investors and that one of those investors who received the inflated valuation invested in the Fund. If the alleged misrepresentation was material to the investing decision and was provided to the new investor as the Court understands the Complaint to allege, then the SEC has adequately alleged a misrepresentation "in connection with the purchase or sale of any security."

Defendants also argue that there is no allegation that the new investor ever read the NAVs or that the investor was permitted to invest in the Side Pocket. But the SEC does not have to prove that the investor actually relied on the inflated NAVs or that the investor lost money as a result of the misrepresentation. *SEC v. Pirate Investor, LLC*, 580 F.3d 233, 239 n. 10 (4th Cir.2009). Defendants' argument that "any investment would have been made outside of the Fund's side pocket and any valuation of the side pocket could not have

been of any import to that investor," goes to materiality, not to the requirement that the misrepresentation be made "in connection with" the purchase or sale of a security.[7,8]

### b. The Materiality Requirement

■ A misstatement or omission violates Section 10(b) and Rule 10b–5 only if it is material. "Materiality is proved by showing a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *SEC v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The standard depends on the actions of a hypothetical "reasonable investor" and thus does not require an inquiry into whether the investors in this case actually considered the statements about the Side Pocket's value material. *See TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. The Court considers whether a reasonable new or potential investor in the Fund would view statements about the value of the Side Pocket as material.

Defendants argue that statements about the value of the Side Pocket cannot be material as a matter of law because the existence of the Side Pocket sent "a powerful signal" that the segregated World Health assets were "illiquid, impaired or hard to value." (Mot. Dismiss Br. 21). The series of public disclosures World Health made during that time frame, in combination with Defendants' statements that valuing the World Health assets would be a challenge, implies, according to Defendants, that the statements about the value of the Side Pocket would not alter the "total mix of information" available to investors. Defendants further argue that because new investors could not invest in the Side Pocket, a reasonable investor would disregard statements about the value of the Side Pocket.

Under Defendant's theory, creating the Side Pocket and calling it hard to value would give fund advisors free reign to assign any value they wish to the Side Pocket. This argument is illogical and contradicts the remedial purpose of the

**7.** The SEC argues in a footnote that the creation of the side pocket may be an alteration to the Fund that was significant enough to constitute a sale and purchase of a security. Citing a case that relies on pre-*Twombly* pleading standards, the SEC states that "on a motion to dismiss, the Defendants cannot show as a matter of law that the diversion of the distressed assets into the 'side pocket' was so insignificant that the transaction does not meet the 'in connection with' requirement." (Resp. Mot. Dismiss 18 n. 4 (citing *Keys v. Wolfe*, 709 F.2d 413 (5th Cir.1983))). Relying on the now-abandoned "no set of facts" pleading standard, *Keys* considered whether it was "beyond doubt that plaintiffs can prove no set of facts in support of their claim which would show a significant change in the nature of their investment." 709 F.2d at 417. *Keys* involved changing an investment to create personal liabilities for taxes, and cited to the example of a corporate reorganization. *Id.*

Under the facts of this case and applying the *Twombly/Iqbal* pleading standard, the Court finds that the SEC has not stated plausible allegations that the creation of the side pocket was such a significant alteration of the nature of the Fund as to constitute a securities transaction.

**8.** The SEC alleges for the first time in its Response to the Motion to Dismiss that the creation of the side pocket was part of a "front-running" scheme to allow Mannion and Reckles to sell their World Health holdings before the Fund did so and at a higher price than if the Fund were simultaneously liquidating its World Heath assets. (Resp. Mot. Dismiss 19). The Complaint, however, does not contain any allegations of front-running. The SEC therefore has not alleged a front-running scheme and may not introduce the allegations in its Response to the Motion to Dismiss.

securities laws. The SEC does not allege that Defendants simply had difficulty valuing the Side Pocket, but that they deliberately inflated the Side Pocket's value. (Compl. ¶ 53). A reasonable investor would know that the valuation of the Side Pocket was less reliable than typical market-traded securities and that the value of World Health assets would be unstable, but they were entitled to expect Defendants to attempt in good faith to determine the best, most accurate value possible for the Side Pocket. Defendants' estimate of the Side Pocket is especially relevant where investors rely on Defendants' investing expertise and specific familiarity with World Health.

■ Even though new investors could not invest in the Side Pocket, the inflated NAVs could be found by a jury to be material to a reasonable new investor's decision to invest in the Fund. A reasonable investor likely would consider it material whether the Fund's advisers had allowed the Fund to lose $4 million versus $10 million on an investment that represented up to 20% of the Fund's assets. (*Id.* ¶¶ 36, 54–55). The allegedly inflated Side Pocket valuation created a false impression that the Fund was performing better, or less poorly, than the Fund was actually performing, as measured by the lower Side Pocket valuations that the Defendants circulated internally. The Court concludes that the Complaint plausibly states that the statements about the Side Pocket's value were material.

c. The Scienter Requirement

■ Rule 10b–5 requires a finding of scienter, which means a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "Severe recklessness" also satisfies the scienter requirement. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.1985). Severe recklessness goes beyond negligence and represents "an extreme departure from the standards of ordinary care," and involves danger of misleading investors "which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (en banc), *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380).

Defendants argue that the SEC must meet the benchmark that the Supreme Court announced in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), under which a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs* interpreted the provision of the Private Securities Litigation Reform Act ("PSLRA") that requires complaints "in any *private* action" to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added). Both *Tellabs* and the PSLRA provision at issue in *Tellabs* were limited to "private actions" and have no application to SEC enforcement actions. On a motion to dismiss, therefore, the SEC need only plead scienter subject to the normal pleading standards announced in *Twombly* and *Iqbal*. *See, e.g., SEC v. Dunn*, 587 F.Supp.2d 486, 500–01 (S.D.N.Y.2008); *SEC v. Patel*, No. 07–cv–39, 2008 WL 781914, at *6 (D.N.H. Mar. 24, 2008). The question under the appropriate standard is whether the SEC has alleged plausible facts either directly showing or otherwise supporting the reasonable inference that Defendants acted with scienter.

■ The SEC argues it has adequately pleaded scienter because the Offering Memo and Placement Memo "communicated ... the precise methodology by which they determined the value of the Fund's investment holdings," while the disputed monthly NAV statements "disregarded the fund's communicated methodology." (Resp. Mot. Dismiss 16; *see also* Compl. ¶ 90 (Defendants "overvalued the Fund's investments in World Health in a manner inconsistent with the disclosed valuation policy")). These allegations do not support an inference that Defendants acted with scienter in these circumstances because the Offering Memo and Placement Memo granted Defendants discretion to assign values to the Fund's assets if in Defendants' view the communicated methodology did not accurately reflect the asset's fair value, and because the Side Pocket Letter disclosed Defendants' intention to deviate from the disclosed methodology.

The Offering Memo for the Palisades Equity Fund states that "if the Manager[9] determines that the value of any security or other investment is not representative of fair value, the Manager shall assign a value to such security or other investment as they may reasonably determine and shall set forth the basis of such valuation in writing in the Fund's records." (Offering Memo 18). The memo further states that "the Manager reserves the right to adjust such valuation in light of market factors." (*Id.*). The Placement Memo for

Palisades Equity Holdings states that "if the Managers, acting in consultation with the Administrator, determine that the value of any security or other investment is not representative of fair value, the directors shall assign a value to such security or other investment as they may reasonably determine and shall set forth the basis of such valuation in writing in the Fund's records." (Placement Memo 16). The governing documents by their own terms granted Defendants discretion to "assign a value ... as they may reasonably determine."

The Side Pocket Letter told the Fund's investors that Defendants would not be using the stated valuation methodology described by the Offering Memo and Placement Memo.[10] The letter informed the investors that Defendants were having difficulty valuing the Fund's holdings of World Health debentures, shares, and bridge loans: "This brings us to our challenge. Valuation.... The challenge that we, the auditors and administrators are having is how to value this investment." (Side Pocket Letter 3). In response to the challenge, the letter informed the Fund's investors that the Defendants "will assign a value to the investment and will update its value each month." (*Id.*). The language "will assign a value" mirrors the language in the Fund's governing documents requiring that Defendants "shall assign a value" if they believe the value

9. The term "Manager" in this instance refers to the General Partner of the feeder fund. The use of "Manager" appears to be a drafting error from converting the Offering Memo from an earlier document that governed a limited liability company or similar legal entity. Defendant PEF Advisors, LLC, which is owned by Mannion and Reckles, is the General Partner of both the feeder fund and the master Fund.

10. The Complaint says that Defendants "were required to inform the Fund's directors so

that a value could be reasonably determined." (Compl. ¶ 45). The Complaint does not allege, however, that the Fund's directors were never informed or that they were not involved in assigning a different value to the Side Pocket. Also, unlike the Placement Memo, the Offering Memo for Palisades Equity Fund, L.P. contains no similar requirement to inform anyone before assigning a value to an asset that differs from the value determined by the disclosed valuation methodology. (Offering Memo 18).

determined by the stated methodology is not representative of fair value. (Offering Memo 18; Placement Memo 16). The statements that Defendants were having difficulty valuing the World Health assets and that they intended to "assign a value" were accompanied by a discussion of how various scenarios—such as a sale of World Health or a bankruptcy—could impact the value of the Fund's World Health investments and about how various factors impacted the total value of the investment. Under these circumstances, it is clear from the Complaint that the Fund investors were informed that the valuations of the Side Pocket were not based on the stated valuation methodology. Defendants' departure from this methodology, therefore, cannot be the basis for a plausible allegation of scienter.[11]

 Other factual allegations in the Complaint, however, create a reasonable inference that Defendants acted with "intent to deceive, manipulate, or defraud," *Hochfelder*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375. Most importantly, the Complaint alleges that the Side Pocket value that Defendants distributed to Fund investors and potential investors conflicted with Defendants' beliefs about the value of the Side Pocket. The August, September, and October NAVs that Defendants distributed to the Fund's investors valued the Fund's World Health debenture at $7.4 million, but a day before Defendants created the $7.4 million figure they valued the debenture at $3.4 million. (Compl. ¶¶ 49, 54–55). The August NAV valued the Fund's holdings of World Health stock at $1.9 million, but the day before Defendants created that figure they internally valued the stock at $0. (*Id.* ¶¶ 48, 54–55). This wide divergence between Defendants' internal estimates of the Side Pocket's value and what Defendants said to existing and potential investors supports the reasonable inference that Defendants acted with the intention of deceiving or manipulating investors. Defendants argue that the situation surrounding World Health's descent into bankruptcy was chaotic and that expectations changed from day-to-day, which is a factual question they may contest at later stages of this litigation. But the extraordinarily short time period—one day—between Defendants' internal valuation of $9.4 million and external valuation of $15.3 million sufficiently supports an inference of intentional deception to survive a motion to dismiss.[12]

11. Although Defendants disclosed the exercise of their discretion to depart from the Fund's stated valuation methodology to Fund investors, it is not clear whether Defendants informed the potential investors that they were soliciting at that time that the Side Pocket valuations provided by Defendants were not based on the disclosed valuation methodologies. But the Complaint only says that Defendants did not use the stated valuation methodology; it does not allege that Defendants withheld or concealed their deviation from that methodology to potential investors. In light of Defendants' disclosure of that fact to Fund investors, the Side Pocket values provided to potential investors do not reasonably support an allegation of scienter.

12. The difference between the external and internal valuations is the most significant factor supporting the inference of scienter. Other allegations, while less significant alone, further support this inference: Defendants' stated "fear [of] large scale redemptions [that] could cause the end of [their] fund," (Compl. ¶ 28); Defendants' failure to disclose that World Health had defaulted on the $6 million in bridge loans provided by the Fund, and, for the September and October NAV Statements, that Defendants had initiated a lawsuit against World Health to collect on the loan, (*id.* ¶ 36); the impact of the inflated NAVs on Defendants' management fees, (*id.* ¶ 59); and, the simultaneous selling by Mannion and Reckles of their personal holdings of World Health stock while representing to Fund investors and potential Fund investors that the Fund's stock was worth $1.9 million, (*id.* ¶¶ 29, 37, 48).

### d. The Allegations Of Fraud

Defendants argue the SEC fails to meet the particularity requirement because the Complaint fails to specify which Defendants made the allegedly misleading statements, when the statements were made, who received the statements, and each Defendant's knowledge at the time each statement occurred. According to Defendants, the SEC "conflates the conduct of each of the Defendants" by engaging in "conclusory 'group' pleading." (Reply Mot. Dismiss 32–33).

■■■ The SEC alleges that both Mannion and Reckles created the NAV Statements that contained the allegedly inflated Side Pocket values. (Compl. ¶ 40). Mannion and Reckles were the principals and co-owners of PEF Advisors LLC and PEF Advisors Ltd., (Compl. ¶¶ 14–17), and they made their allegedly misleading statements to Fund investors and potential investors "through their investment-adviser entities PEF Advisors Ltd. and PEF Advisors LLC," (Compl. ¶ 2). The Complaint states that "Mannion and Reckles knew, or were reckless in not knowing, that the August 2005 NAV valuation was improper," (Compl. ¶ 55), and that "Defendants knew, or were reckless in not knowing" that the August, September, and October 2005 NAV Statements were "improperly materially inflated," (Id. ¶ 57). The Complaint further alleges that the allegedly misleading Side Pocket valuations were communicated to potential investors. Although the Complaint does not state the investor's name, it contains sufficient information to particularly identify the one new investor that was "provided the inflated valuations" and that "invested $3 million in the Fund." (Id. ¶ 60). Based on these allegations the Court concludes that the SEC has supported its theory of fraud with sufficient particularity.

### 2. Section 206(1) Of The Investment Advisers Act

Section 206(1) of the Advisers Act makes it unlawful for an investment adviser "to employ any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b–6(1). Defendants argue that the Overvaluation Allegations do not support a claim under Section 206(1) because the Fund investors were not Defendants' clients as required by Section 206(1), because the Complaint inadequately pleads that the misrepresentations were material and made with scienter, and because the allegations of fraud are not stated with particularity.

### a. The Requirement To Allege Fraud Against A "Client"

Defendants first argue that Section 206(1) is limited to fraud by investment advisers against clients. Relying on *Goldstein v. SEC*, 451 F.3d 873 (D.C.Cir.2006), they argue the SEC has failed to state a cause of action under Section 206(1) because the Complaint only alleges fraud against Fund investors, while Defendants' client for purposes of Section 206(1) is only the Fund.

In *Goldstein*, the D.C. Circuit Court of Appeals held that under the Investment Advisers Act, a hedge fund adviser's client is the hedge fund itself, not the investors in the hedge fund. 451 F.3d 873. The *Goldstein* court noted that investment advisers provide individualized advice to investors "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." *Id.* at 879. While investors in a hedge fund may benefit from the fund adviser's advice to the fund, the investor does not receive or benefit from the advice directly. *Id.* at 879–80. "The adviser does not tell the *investor* how to spend his money; the investor made that decision when he invested in the

fund. Having bought into the fund, the investor fades into the background; his role is completely passive." *Id.* at 880. *Goldstein* further noted that advisers owe fiduciary duties to the funds they advise and as a result do not simultaneously owe fiduciary duties to fund investors whose interests might conflict with the fund's interests. *Id.* at 881.

■ Based on the reasoning of *Goldstein,* the Court concludes that to support a claim under Section 206(1), the SEC must plausibly allege that Defendants employed a "device, scheme, or artifice to defraud" the Fund itself, rather than the Fund's investors. The SEC tries to differentiate this case from *Goldstein* by arguing in a footnote that Defendants created an adviser-client relationship with the Fund's investors when they sought consent from the investors to create the Side Pocket. The SEC cites *United States v. Lay,* 612 F.3d 440, 446–47 (6th Cir.2010), in support. The reasoning of *Lay,* however, does not apply to these circumstances. The *Lay* opinion was based on the unique circumstances of that case, where the hedge fund investor "was the only investor in the [hedge fund] at the relevant time and the [investor] had an active role in its [hedge fund] investment," as indicated by the meetings between the investor's principal and the hedge fund's advisor. *Id.* at 446. The SEC's Complaint does not contain allegations analogous to those in *Lay.* The Court concludes that the single communication to investors seeking consent to make a temporary change to the Fund does not support the reasonable inference

that the Fund's investors were clients of the Defendants.

The SEC also argues that the Complaint contains allegations that Defendants defrauded the Fund, because the intentional overvaluation of the Side Pocket caused Defendants to receive improperly inflated management fees. (Compl. ¶ 59). Defendants respond that the allegation that they fraudulently induced the Fund to pay inflated management fees is not an accusation that they defrauded the Fund, because the "Fund stands as a legal entity made up of the assets of its investors. . . . Any payment of inflated management fees relates to the investors whose investments would be reduced by the higher management fees, and not the Fund itself." (Reply Mot. Dismiss 11).

Defendants' argument is not persuasive. They cannot argue that the Fund is the only entity that can be defrauded under Section 206(1) and simultaneously argue that the Fund is a legal entity that cannot be defrauded because any harm ultimately passes through to the investors. This result is illogical and cannot be squared with the text of the statute. Just as a hedge fund's investors are not clients of the hedge fund adviser, even though they benefit indirectly from the hedge fund adviser's advice, *Goldstein,* 451 F.3d at 878–80, a fraud against a hedge fund is not ignored simply because the harm is indirectly borne by the fund's investors.[13] Regardless of how the ultimate harm is imposed the alleged fraud against the Fund—De-

**13.** Defendants' argument is similar to a failed argument that the SEC made in *Goldstein.* The SEC argued in that case that "the organizational form of most hedge funds is merely 'legal artifice' to shield advisers" who wanted to remain exempt from the SEC's proposed registration requirements. *Goldstein,* 451 F.3d at 882 (citations omitted). The *Goldstein* court rejected this argument, noting that

"form matters in this area of the law because it dictates to whom fiduciary duties are owed." *Id.* Similarly, having set up the Fund as a legal entity made of investor assets, Defendants now owe certain duties to the Fund under the Advisers Act. Defendants are not now free to defraud the Fund on the grounds that the harm is ultimately borne by the investors.

fendants' client—is sufficient to support a claim under Section 206(1).

### b. Materiality, Scienter, and Fraud

█ Defendants next argue that the SEC's Overvaluation Allegations fail to support a claim under Section 206(1) because the allegations do not sufficiently allege materiality or scienter, and because the allegations of fraud do not meet the particularity requirements of Federal Rule of Civil Procedure 9(b). For the same reasons discussed by the Court in its consideration of the Section 10(b) and Rule 10b–5 claim, the Court finds that the Complaint adequately alleges scienter and fraud. The single day between internally valuing the Side Pocket at $9.4 million and externally valuing it at $15.3 million in the August 2005 NAV Statement that formed the basis of Defendants' management fees reasonably supports the inference that Defendants intentionally inflated the Side Pocket's value. The allegations that both Mannion and Reckles created the NAV Statement that contained the allegedly inflated Side Pocket valuation and that they acted through PEF Advisors LLC and PEF Advisors Ltd, which they co-owned and of which they were the principals, pleads "the who, what, when, where, and how" of the alleged fraud, *Garfield*, 466 F.3d at 1262, with sufficient particularity.

█ The Court briefly addresses the materiality requirement because the nature of the fraud that the Overvaluation Allegations support under Section 206(1) differs slightly from what they support under Section 10(b) and Rule 10b–5. Because of the "in connection with" requirement, the fraud under Section 10(b) relates to the dissemination of inflated NAVs to potential investors that proceeded to invest in the Fund. The limitation of Section 206(1) to actions that defraud the Fund rather than the Fund's investors means the fraud under that section relates to

overvaluing the Side Pocket to receive improperly inflated management fees. Still, because the alleged scheme to overvalue the Side Pocket had the effect of depriving the Fund of assets to which it was entitled by requiring it to pay management fees to Defendants to which they were not entitled, the Court concludes that the Complaint adequately pleads materiality.

### 3. Section 206(2) Of The Investment Advisers Act

█ Section 206(2) of the Advisers Act makes it unlawful for an investment adviser "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b–6(2). Like Section 206(1), Section 206(2) "imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors, and includes an obligation to provide 'full and fair disclosure of all material facts' to investors and independent trustees of the fund." *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir.2008), *withdrawn*, 573 F.3d 54 (2009), *reinstated in part*, 597 F.3d 436 (2010) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). Unlike Section 10(b) and Section 206(1), Section 206(2) "does not require a 'showing of deliberate dishonesty as a condition precedent to protecting investors.'" *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (quoting *Capital Gains*, 375 U.S. at 200, 84 S.Ct. 275). Plaintiffs are not required to plead scienter to sustain a claim under Section 206(2) and "need only allege negligence." *Tambone*, 550 F.3d at 146; *see also SEC v. Steadman*, 967 F.2d 636, 643 n. 5 (D.C.Cir. 1992) ("a violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence").

■ Defendants argue that only negligent actions satisfy Section 206(2). But the cases interpreting Section 206(2) say that it does not "require proof of intent to injure and actual injury to the client," *Capital Gains,* 375 U.S. at 195, 84 S.Ct. 275. This does not imply that allegations of intentional deception will not support a claim under Section 206(2), or that only negligent actions can "operate as a fraud or deceit," 15 U.S.C. § 80b–6(2). Rather, they say that the actions must at least be negligent. A deliberate fraud or misrepresentation, however, can also operate as a fraud or deceit.

The SEC further argues that the facts establishing fraud also establish that Defendants negligently breached their fiduciary duty to act in the best interests of the Fund. Defendants reply by pointing to the "inherent contradiction" in alleging that Defendants' conduct was both intentional and unintentional. (Reply Mot. Dismiss 19). The Federal Rules of Civil Procedure, however, permit plaintiffs to plead inconsistent claims. Fed.R.Civ.P. 8(d)(3). It may be that a claim of negligence will be difficult to prove in this case, since the Fund's governing documents granted Defendants discretion to value assets and the letter from Mannion and Reckles that requested approval to create the Side Pocket informed the Fund investors that Defendants would exercise that discretion. It is enough at this stage, however, that the allegations that Defendants intentionally deceived the Fund by issuing NAV Statements with knowingly false estimates of the Side Pocket's value also reasonably support the inference that Defendants did not take reasonable care to ensure that their actions did not violate their duty to the Fund to fairly value the Side Pocket assets where that valuation would partially determine Defendants' management fees. *See SEC v. Nacchio,* 438 F.Supp.2d 1266, 1283 (D.Colo.2006) (because complaint adequately pleaded scienter, argument that complaint failed to adequately plead negligence was without merit).

## C. *The Misappropriation Claims*

The SEC alleges that Defendants misappropriated Fund assets under all three counts of the Complaint: Section 10(b) and Rule 10b–5, Section 206(1), and Section 206(2). Defendants argue that the Misappropriation Claim should be dismissed under all three counts because the Complaint does not adequately plead materiality. Defendants further argue that the Complaint does not adequately plead scienter as required under Section 10(b) and Section 206(1), and does not plead willful negligence under Section 206(2).

### 1. *Materiality Of The Misappropriation Claim*

All three claims in the Complaint, under Section 10(b) of the Exchange Act and Section 206(1)-(2) of the Advisors Act, require the alleged misstatement or omissions to be material. The SEC alleges that "Mannion and Reckles stole and exercised what were, at the time of the theft, extremely valuable World Health warrants that belonged to the Fund." (Compl. ¶ 64). The SEC further alleges that "Mannion and Reckles improperly borrowed $2 million from the Fund to finance a personal investment," and borrowed $13,000 of the Fund's assets to pay for services provided to Defendants and to pay purchase warrants for Mannion and Reckles' benefit. (*Id.* ¶¶ 67–68).

Defendants argue the allegation they "stole" the warrants is insufficient to satisfy the materiality requirement because the SEC does not specifically plead that Mannion and Reckles failed to disclose their acts to the Fund investors. The Court concludes, however, that the terms "steal" and "theft" adequately allege that the warrants were exercised without per-

mission or knowledge of the Fund or its investors.

Defendants further argue that the claims that they misappropriated Fund assets when they took the undisclosed loans must be dismissed for failure to plead materiality. The $2 million and $13,000 loan were not material, Defendants assert, because "both were promptly repaid" and there is "no allegation that the monies were ever put at risk by Defendants." (Mot. Dismiss Br. 23). Defendants also rely on the Fund's governing documents' lack of an express bar on Defendants using Fund assets to finance personal investments.

▆▆ Defendants' arguments are without merit. First, it is not necessary for the Fund's governing documents to expressly prohibit using Fund assets for personal gain, because the Advisers Act obligates Defendants to act for the benefit of the Fund rather than diverting Fund assets for personal use. Also, the Offering Memo and Placement Memo represent that Fund assets will be used to generate investment returns for the Fund and its investors and not to finance personal investments and purchases by Defendants.

Second, a reasonable factfinder could conclude that it is material that the advisors of the Fund used Fund assets for purposes other than for the benefit of the Fund. See I-Enterprise Co. v. Draper Fisher Jurvetson Mgmt. Co. V, No. C-03-1561-MMC, 2005 WL 3590984, at *22 (N.D.Cal.2005) ("a reasonable trier of fact could find that an investor would deem it material that fund assets were being used to purchase stock for others at the fund's expense, even if that money was later repaid"). Even if the periods of the unauthorized loans were short, that was time when those funds were not being used to generate returns for the Fund. And diverting funds away from the Fund, even for a short period of time, always carries with it the risk that some or all of the money will be lost or at least unavailable for some period of time. Cf. Jones v. SEC, 115 F.3d 1173, 1184 (4th Cir.1997) (noting that even if funds were ultimately repaid, defendant still "subjected investors' funds to undisclosed risks"). The Court concludes the Complaint adequately pleads materiality with respect to the Misappropriation Claims.

2. *Allegations of Scienter For The Misappropriation Claims Under Section 10(b) and Section 206(1)*

Defendants argue that the Complaint inadequately pleads scienter, as required for actions under Section 10(b) and Rule 10b-5 and actions under Section 206(1). According to Defendants, the SEC fails to allege that Defendants failed to disclose the exercise of the warrants to Fund investors, and fails to allege that the personal loans were accompanied by an intention to deceive.

The SEC is permitted, however, to plead intent generally. Fed.R.Civ.P. 9(b); *see SEC v. Dunn*, 587 F.Supp.2d 486, 500-01 (S.D.N.Y.2008) (heightened pleading standard for scienter does not apply to SEC enforcement actions). The allegation that Defendants "stole" the warrants is sufficient to plead that Defendants acted with intent to deceive. The allegations that the loans of Fund assets for Defendants' personal use and gain were not disclosed to the Fund support that those actions were done with the intent to deceive.[14]

14. Defendants also argue that the SEC has failed to adequately plead willful negligence as required by Section 206(2). These allegations also support the alternative finding that Defendants failed to exercise reasonable care to avoid breaching their fiduciary duty to the Fund to act in the Fund's interests and to disclose the Defendants' conflicts of interests with the Fund.

### D. *The PIPE Transaction Misrepresentation Allegations*

The SEC claims that the conduct described by the PIPE Transaction Misrepresentation Allegations violated Section 10(b) and Rule 10b–5. Defendants argue this claim must be dismissed because the Complaint does not adequately allege materiality, scienter, or fraud.

#### 1. *Materiality*

To participate in the Radyne PIPE Transaction, Defendants were required to sign the Share Purchase Agreement ("SPA") and represent that the Fund did not, directly or indirectly, hold any short positions of Radyne shares. (Compl. ¶¶ 81–82). This representation was false, however, because the Fund held short positions on 60,000 Radyne shares. Defendants argue the misrepresentation is not material because the Complaint does not allege that the SPA's prohibition on short positions was a material term to the transaction.

■■■ The question on a motion to dismiss, however, is not whether the term was material but whether the allegations in the Complaint support the inference that a reasonable seller participating in the PIPE Transaction would consider the omitted fact material. In *SEC v. Berlacher*, No. 07–3800, 2010 WL 3566790, at *13 (E.D.Pa. Sept. 13, 2010), the defendant had signed the same SPA for the same PIPE transaction that is at issue in this case. After a bench trial, the *Berlacher* court concluded that it is "fair to assume that had Radyne . . . been aware that Berlacher had engaged in transactions on [its] securities with knowledge of the pending PIPE and prior to signing the SPAs, [it] would have refused to sell the PIPE stocks to Berlacher." *Id.* The Court agrees with the *Berlacher* court and concludes that a reasonable trier of fact could find that the seller of the Radyne shares would consider it material whether the Fund held a short position on Radyne stock.

#### 2. *Scienter*

Defendants argue that the "Complaint similarly fails to allege any intentional—or even highly reckless—conduct by Defendants in connection with the alleged Radyne misrepresentation that was tantamount to deception." (Mot. Dismiss Br. 31). Unlike private litigants in a securities fraud case who must plead scienter with particularity, the SEC is only required to allege scienter subject to the *Twombly/Iqbal* pleading standard. That is, the Complaint must allege plausible facts or suggest reasonable inferences that, if taken as true, would support a finding of scienter.

■■■ The SEC directly alleges that Defendants "knowingly or recklessly made material misrepresentations with respect to short positions taken by the Fund in connection with the purchase of Radyne securities." (Compl. ¶ 90). Under the facts of this case the Court concludes this is a plausible allegation of scienter. Mannion knew about the PIPE transaction and that it was confidential because he was the one who discussed the transaction with Roth. (*Id.* ¶¶ 72–77). Reckles knew about the SPA because he faxed the SPA signature pages to Roth. (*Id.* ¶ 83). Because Mannion and Reckles are co-principals and co-owners of the Fund adviser entities, it is plausible to assume that both were involved in the decision to direct the Fund to sell short the Radyne shares, based on their mutual knowledge of the confidential details of the PIPE Transaction. (*Id.* ¶ 80). The Complaint further alleges that the actual misrepresentation—the execution of the SPA, which attested that the Fund "did not hold a short position, directly or indirectly, in any shares of the Company's stock," (*Id.* ¶ 82)—occurred "at the Defendants' direction," (*Id.* ¶ 81), which is

plausible in light of Mannion and Reckles' status as co-principals and co-owners of the advisor entities and their alleged knowledge of the transaction.

### 3. Fraud

Defendants finally argue that the PIPE Transaction Misrepresentation Allegations do not state the circumstances of fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Defendants assert that the Complaint fails to allege that any of the Defendants signed the SPA, but the Complaint plausibly alleges that both Mannion and Reckles together directed another person to sign to the SPA. (*Id.* ¶ 81). Defendants say the Complaint fails to allege that whichever Defendant directed the deceptive signing of the SPA had knowledge of the misrepresentation, but the Complaint alleges that Defendants acted "knowingly or recklessly," (*Id.* ¶ 90), and that allegation is plausible and is permitted to be made generally. Defendants complain that the recipients of the alleged misrepresentation are not alleged, but it is clear from the Complaint that the recipients are Roth, (*id.* ¶ 83), and the counterparty to the SPA, the sellers of the Radyne stock. The Court therefore concludes that the SEC has alleged fraud with sufficient particularity.

### E. Defendants' Motion for Oral Argument

Defendants request oral argument on their Motion to Dismiss. The Court finds that the parties have had sufficient opportunity to brief the issues presented in the motion and that a hearing will not be helpful to the Court. *See* L.R. 7.1E, NDGa ("Motions will be decided by the court without oral hearing, unless a hearing is ordered by the court."). Defendants' Motion for Oral Argument is therefore **DENIED**.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [18] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** to the extent Plaintiff alleges in Count I violations of Section 10(b) and Rule 10b–5 with respect to investors in the Fund other than the investor who invested $3 million in the Fund (*see* Compl. ¶ 60). It is further **GRANTED** to the extent Plaintiff alleges in Counts II and III violations of Section 206(1) and (2) that involve fraud against the Fund's investors rather than against the Fund itself. The Motion is **DENIED** as to the other grounds asserted in the Motion.